THE STATE OF OHIO, APPELLEE, *v.* HUERTAS, APPELLANT.

[Cite as State *v.* Huertas (1990), 51 Ohio St. 3d 22.]

(No. 88-1627—Submitted January 9, 1990—Decided May 9, 1990.)

*Gregory A. White,* prosecuting attorney, and *Jonathan E. Rosenbaum,* for appellee.

*Randall M. Dana,* public defender, *Joann Bour-Stokes, Richard J. Vickers* and *Sharon H. Hainley,* for appellant.

H. BROWN, J. For the reasons which follow, we affirm appellant's conviction, but vacate the sentence of death and remand for imposition of a life sentence in accord with *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 513 N.E. 2d 744.

## I
## Admission of Victim Impact Evidence

In his second proposition of law, appellant challenges the use of victim impact evidence at the penalty phase of his trial.

In the instant case, appellant requested a presentence investigation report pursuant to R.C. 2929.03(D)(1). The report contained a summary of an interview with the victim's parents, Ralph, Sr., and Elizabeth Harris, in which Mr. Harris expressed the view that appellant should be sentenced to death. This report was admitted into evidence. The prosecution also called Mr. and Mrs. Harris as rebuttal witnesses.

Mrs. Harris testified concerning the victim's good character. When asked if she was proud of her son, she replied, "Oh, God, how proud I was, a child that never give me no problem, no nothing, no drinking, no smoking, nothing but go to church and come back * * *." She described the effect on the victim's son[1]: "I hate to take him to the graveyard. He always wants to go. He think[s] he [is] going to see

_____
[1] The victim's child, Ralph Harris III, was the product of a previous relationship.

his dad." Mr. Harris testified, in response to a question from the prosecutor, that he believed appellant should get the death penalty.

In *Booth* v. *Maryland* (1987), 482 U.S. 496, decided after the trial of the instant case but before the court of appeals issued its opinion, the United States Supreme Court held that the introduction of victim impact evidence in the penalty phase of a capital trial is constitutionally impermissible. Victim impact evidence is defined in *Booth* as including evidence which describes the personal characteristics of the victim, the emotional trauma suffered by the victim's family, or the family members' opinions and characterizations of the defendant and the crime. *Id.* at 502. The court reasoned that "[t]he prospect of a 'mini-trial' on the victim's character * * * could well distract the sentencing jury from its constitutionally required task — determining whether the death penalty is appropriate in light of the background and record of the *accused* and the particular circumstances of the crime. * * *" (Emphasis added.) *Id.* at 507. The holding of *Booth* was reaffirmed in *South Carolina* v. *Gathers* (1989), 490 U.S. ___, 104 L. Ed. 2d 876, 109 S. Ct. 2207.

In *State* v. *Post* (1987), 32 Ohio St. 3d 380, 383, 513 N.E. 2d 754, 758, we noted that the admission of victim impact evidence at capital trials was not expressly permitted by the Ohio statutes. However, in *Post* and two subsequent cases, *State* v. *Sowell* (1988), 39 Ohio St. 3d 322, 530 N.E. 2d 1294, and *State* v. *Brewer* (1990), 48 Ohio St. 3d 50, 549. N.E. 2d 491, we found the admission of such evidence harmless in *bench* trials where there was no indication that the three-judge panel relied on the victim impact evidence in arriving at its sentence. See, *e.g., Post, supra,* at 384, 513 N.E. 2d at 759.

Four arguments have been advanced by the state to distinguish the present case from *Booth* and *Gathers*. These are: (1) Ohio's use of a sentencing system where the jury's recommendation of a death penalty is not binding on the trial judge, (2) distinctions between the victim impact evidence in the instant case and that presented in *Booth,* (3) the victim impact evidence in this case was presented to rebut appellant's mitigation evidence, and (4) *Booth* and *Gathers* allow for victim impact evidence where the killer is acquainted with the victim.

## A

### Jury Recommendation

The prosecution argues that *Booth* v. *Maryland, supra,* is distinguishable from the instant case because an Ohio jury's recommendation of death is not binding on the trial judge, while a Maryland jury makes the final determination of sentence. Compare Md. Ann. Code (1987), Article 27, Section 413(K)(1), with R.C. 2929.03(D)(3). We are urged to extend *Post* to jury trials and require the defendant to show that the sentencing *judge* was influenced by victim impact evidence before the sentence may be reversed.

We find this argument unpersuasive for two reasons. First, the *Booth* court held that the admission of victim impact evidence in the sentencing phase of a capital jury trial is constitutional error. Second, in *Gathers, supra,* the *Booth* rule was applied to a case decided under South Carolina's capital punishment statutes, which use a "recommendation" system similar to Ohio's. See S.C. Code Ann. (1985), Section 16-3-20(C).

## B

### Distinctions Based on Quality of the Evidence

The court below found the admission of the victim impact statement to be harmless error because it was much shorter than that at issue in *Booth,* and because it contained statements blaming Elba Ortiz for "deceiving" the victim, which the court viewed as "favorable" to appellant. We do not agree.

It is true that the written victim impact statement at issue in *Booth* was longer and more detailed than that involved in the instant case, see *Booth* at 509-515, but *Booth* prohibits consideration of victim impact evidence. In *Gathers, supra,* the court, without reference to any presentence investigation reports or statements by surviving family members, held that it was constitutional error for the prosecutor, in his closing argument, to draw inferences about the victim's good character based on the contents of his pockets.

Further, even if the quantity and quality of the evidence were somehow relevant under *Booth* and *Gathers*, we would still find it necessary to vacate the sentence of death. Mrs. Harris's grief-stricken, emotional testimony is compelling even in a cold transcript; it is almost impossible to believe that a jury could hear it and remain unaffected.

## C

### Rebuttal of Mitigating Evidence

The prosecution argues that the Harrises' testimony was offered to rebut appellant's mitigating evidence. During the penalty phase of the trial, appellant presented testimony from his family and an expert, Dr. Thomas Haglund, to the general effect that appellant was basically a good person whose crime was, in part, caused by his problems with drugs and alcohol. Appellant himself, in an unsworn statement, expressed remorse and begged forgiveness.

The prosecution was certainly entitled to rebut the validity of

appellant's assertions.[2] However, the Harrises' testimony does not serve this purpose. Their testimony did not relate to appellant's character, his family or drug problem.[3] It was not rebuttal testimony.

## D
## Appellant's Knowledge of Victim's Family

*Booth* and *Gathers* prohibit introduction of victim impact evidence which is not "relate[d] directly to the circumstances of the crime. * * *" *Booth, supra,* at 507, fn. 10; *Gathers, supra,* at ____, 104 L. Ed. 2d at 883, 109 S. Ct. at 2211. Impliedly, there may be an exception to the *Booth* rule when the victim impact evidence relates to the circumstances of the crime. (See *Booth, supra,* at fn. 10.) It is urged that the instant case falls under this exception because appellant was acquainted with the victim and his family.

The purpose of the *Booth* rule is to ensure that the jury, in its sentencing decision, considers only that evidence which "has some bearing on the defendant's 'personal responsibility and moral guilt.' * * *" *Booth, supra,* at 502, quoting *Enmund* v. *Florida* (1982), 458 U.S. 782, 801. In most cases, the mere fact that the killer knows his victim does not make him more or less deserving of the death penalty. For example, if appellant and Ralph Harris had not been friends, and all other circumstances had been the same, we doubt that anyone would consider the crime less heinous. In order to bring in victim impact evidence under the "circumstances of the crime" exception to *Booth,* the state must show a connection to the defendant's "personal responsibility and moral guilt."[4]

## E
## Testimony Recommending a Death Sentence

Finally, the type of evidence given by the victim's family in this case goes beyond that considered in *Booth* and *Gathers, supra.* Here, a family member offered his opinion on what the appropriate sentence would be for the defendant.

A distinction should be drawn, in considering victim impact evidence, between (1) evidence relating to the victim's character, (2) evidence relating to the circumstances of the crime, and (3) evidence consisting of the opinions of the victim's family as to an appropriate punishment for the defendant. The dissenting justices in *Booth* and *Gathers, supra,* argue that

---

[2] For example, in his cross-examination of Arlene Huertas, the prosecutor attacked her claim that appellant was a good father by eliciting testimony that appellant never paid child support.

[3] Mrs. Harris also gave an account of the altercation between Ralph, Jr., and appellant a week before the murder which duplicated her testimony in the guilt phase. Since the jury had already found appellant guilty of aggravated murder with prior calculation and design, it is apparent that it had already accepted her version of events and discredited appellant's conflicting testimony. Further, appellant presented no testimony in the penalty phase which called Mrs. Harris's account into question.

[4] For example, if the defendant's motive for committing murder was to inflict emotional trauma on the victim's family, victim impact evidence would be relevant to the defendant's personal responsibility and moral guilt. See, *e.g., State* v. *Morales* (1987), 32 Ohio St. 3d 252, 513 N.E. 2d 267 (murder committed as part of revenge plot against victim's older brother).

evidence of the suffering caused by a particular crime can be considered relevant to the defendant's culpability or moral guilt. See *Gathers, supra,* at ___, 104 L. Ed. 2d at 887-888, 109 S. Ct. at 2214-2215 (O'Connor, J., dissenting); *Booth, supra,* at 519-520 (Scalia, J., dissenting). Such evidence is specifically required to be considered by the sentencing court in some noncapital cases. R.C. 2947.051. However, statements by a member of the victim's family recommending a particular punishment, such as Mr. Harris's penalty phase testimony, have nothing to do with culpability or moral guilt. They are simply opinions on the appropriate sentence given by someone who, though having a great personal interest in the outcome, is not a member of the jury. These opinions go to the ultimate issue, usurp the jury's function and undermine the defendant's right to trial by an impartial court.

Opinions with respect to an appropriate punishment distract the jury from its constitutional and statutory obligation to weigh mitigating factors against aggravating circumstances. Such opinions, if credited, could make imposition of punishment dependent upon whether the victim's family believed in or was opposed to capital punishment (and not "the background and record of the accused and the particular circumstances of the crime").

We therefore hold that expressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate the defendant's constitutional right to

have the sentencing decision made by the jury and judge.

After reviewing the arguments presented, we find no grounds on which to distinguish *Booth* and *Gathers,* and we are thus compelled to follow those cases, vacate the sentence of death, and remand for imposition of a life sentence in accord with *Penix, supra.*

## II

### Voluntary Intoxication

Appellant called Dr. Thomas Haglund as an expert witness in the guilt phase to testify on the effects of intoxication and the ability of an intoxicated person to suffer a blackout. The prosecution objected, and the court refused to permit Dr. Haglund to testify. Defense counsel proffered the testimony to negate the existence of prior calculation and design. In his first proposition of law, appellant contends that he was prevented from presenting evidence that he was incapable of forming specific intent as permitted by *State* v. *Fox* (1981), 68 Ohio St. 2d 53, 22 O.O. 3d 259, 428 N.E. 2d 410.

A defendant may present nonexpert testimony in an effort to prove that he was " ' "so intoxicated as to be mentally unable to intend anything ([*i.e.*] unconscious)[.]" ' " *State* v. *Wilcox* (1982), 70 Ohio St. 2d 182, 194, 24 O.O. 3d 284, 291, 436 N.E. 2d 523, 530, quoting *State* v. *Jackson* (1972), 32 Ohio St. 2d 203, 206, 61 O.O. 2d 433, 434, 291 N.E. 2d 432, 433; see, also, *Fox, supra.* However, Ohio law does not recognize the defense of "diminished capacity."[5] *Wilcox, supra,*

---

[5] The "diminished capacity" defense has been defined by one commentator as arising when "a sane defendant's mental abnormality at the time of the crime prevented him from entertaining the

specific mental state prescribed by statute. * * *" Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage (1977), 77 Colum. L. Rev. 827, 828. If asserted suc-

paragraph one of the syllabus. Further, except in the mitigation phase, a defendant may not introduce *expert* psychiatric testimony unrelated to the insanity defense for the purpose of showing that he lacked the capacity to form the specific mental state required for a particular crime. *Id.* at paragraph two of the syllabus; *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, 544 N.E. 2d 895, paragraph one of the syllabus.

The arguments which appellant makes are the same as those advanced in *Cooey*. If accepted, they "would bring into Ohio law, under another guise, the diminished capacity defense we rejected in *Wilcox*. * * *" *Cooey, supra,* at 26, 544 N.E. 2d at 906. Appellant has not proffered any argument which would persuade us to depart from the *Wilcox* rule, and so we reject his second proposition of law on authority of *Cooey* and *Wilcox, supra.*

Appellant advances a related contention in his twelfth proposition of law. He claims that "[i]nsufficient evidence existed for prior calculation and design in this case because [appellant] * * * was intoxicated at the time of the offense."

The mere fact that a defendant is intoxicated does not make him incapable of acting with prior calculation and design. Intoxication "is often voluntarily induced for the sole purpose of nerving a wicked heart to the firmness requisite for the commission of a crime soberly premeditated, or as an excuse for such crime. * * *" *Nichols* v. *State* (1858), 8 Ohio St. 435, 439-440.

We have reviewed the testimony and find that there was sufficient evidence from which reasonable minds could find prior calculation and design. A week before the killing, appellant threatened to "waste" Ralph Harris, Jr., if he continued to see Elba Ortiz. On the night he killed Harris, appellant, though intoxicated, was able to secure a knife, drive across town, break into the apartment, stab Harris, dispose of the knife, and drive himself home. While appellant testified that he suffered a "blackout" from his intoxication, it is apparent that the jury chose not to believe him.

Because there was "substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt[,]" *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 10 O.O. 3d 340, 383 N.E. 2d 132, syllabus, we reject appellant's twelfth proposition of law.

### III
### Multiple Murder Convictions

In his third proposition of law, appellant claims that his conviction and sentencing on two counts of aggravated murder for a single killing violated R.C. 2941.25 and the Double Jeopardy Clauses of the Ohio and United States Constitutions. Though this issue was not raised at trial or in the court below, the prosecution has conceded that appellant cannot be convicted twice for a single offense. Accordingly, we hold that, on remand, appellant should be given only a single life sentence for the aggravated murder offense.

Appellant also contends that the jury improperly "double counted" the

---

cessfully in a jurisdiction where it is recognized, it "results in the reduction of the offense to one with a lesser maximum penalty which does not require proof of the specific intent at issue." *Id.* at 829.

For a more complete discussion of the diminished capacity defense, see *Wilcox, supra,* at 184-199, 24 O.O. 3d at 286-294, 436 N.E. 2d at 525-533.

aggravating circumstances when weighing them against the mitigating evidence. In view of our disposition of appellant's death sentence, we need not consider this contention.

## IV

## Exclusion of Jurors for Cause

In his eighth proposition of law, appellant argues that the trial court, over defense objection, improperly excused three prospective jurors, Penny Potts, Ina Hammond and Cheryl Yagielo, for cause because they expressed opposition to the death penalty.

Mrs. Potts said that she was "not totally opposed" to capital punishment, but "would much rather go with the sentence to prison and hope that they changed." "I hope they come out with a better attitude than to kill them, whatever you want to call it," she stated. She agreed that voting for a life sentence would be easier than voting for the death penalty. After the prosecutor challenged her for cause, the following exchange took place:

"THE COURT: * * * Would you be able to follow exactly my instructions, or would you let your own views get in the way?

"We can't always take the easier route. Sometimes we have to do what is required and you would have to follow, it's really the law of Ohio that I am giving you.

"You think you would be able to do this?

"MRS. POTTS: Probably not.

"But my views would probably come back and get in the way."

"THE COURT: You would be in conflict?

"MRS. POTTS: Yes, sir."

Mrs. Hammond said she would try to be impartial and follow the judge's instructions, but did not really believe in the death penalty. Even if other jurors voted for the death penalty, she admitted, "I guess I would say I wouldn't vote for it, to be honest with you."

Ms. Yagielo was not opposed to the death penalty, but expressed doubts that she, personally, "could send someone to their death." When asked if there was any circumstance under which she could vote for the death penalty, she answered, "No." The judge excused Ms. Yagielo for cause without allowing defense counsel to voir dire her.

The standard for excusing a prospective juror based upon the juror's views on capital punishment is whether those views would "prevent *or substantially impair* the performance of his duties as a juror in accordance with his instructions and oath." (Emphasis added.) *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 17 OBR 414, 478 N.E. 2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002. "* * * The determination of juror bias necessarily involves a judgment on credibility, the basis of which often will not be apparent from an appellate record. *Wainwright* v. *Witt* (1985), 469 U.S. 412, 429. For this reason, '* * * deference must be paid to the trial judge who sees and hears the juror.' *Id.* at 426. * * *" *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 280, 528 N.E. 2d 542, 549-550.

Applying these standards, we discern no abuse of the trial court's discretion. All three prospective jurors indicated that their views on the death penalty would, at least, substantially impair their ability to follow the judge's instructions. Though it would have been better practice for the court to allow defense counsel to voir dire Ms. Yagielo, her unequivocal statement that she could never vote for the death penalty is, in itself, a sufficient

basis to support her removal. We therefore reject appellant's eighth proposition of law.

## V

### Restrictions on Voir Dire Inquiry

In his sixth proposition of law, appellant contends that the trial judge unduly restricted his inquiry into jurors' views on the death penalty during individual voir dire. This issue was not raised in the court of appeals, and could be considered waived. *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364, vacated in part (1978), 438 U.S. 911; *Toledo* v. *Reasonover* (1965), 5 Ohio St. 2d 22, 34 O.O. 2d 13, 213 N.E. 2d 179, paragraph two of the syllabus.

Normally, we would be reluctant to consider an issue of this importance to be waived in a capital case. However, in view of our disposition of appellant's death sentence, any error in the process of "death qualifying" the jury has been rendered moot, and we therefore decline to address the issue.[6]

## VI

### Public Voir Dire

In his seventh proposition of law, appellant contends that he was denied a right to a fair trial because the judge conducted the voir dire in public.

Initially, the trial court excluded the press and public from the voir dire proceedings pursuant to a motion by appellant. On the first day, two potential jurors were excused for medical reasons, and nineteen potential jurors were questioned. At the beginning of the second day, an attorney for the Lorain Journal appeared in court and asked the court to reconsider its exclusionary order. Appellant and the state opposed this motion.

After hearing arguments, the court rescinded its previous ruling, stating that, "[w]e have gone through 19 prospective Jurors; and I found nothing that would be so embarrassing that there is a further need for sequestration." Appellant was granted a continuance in order to make an interlocutory appeal. The court of appeals dismissed it for lack of a final appealable order. Voir dire was resumed after a delay of about a month.

The constitutional guarantee of open public proceedings in criminal trials extends to voir dire examinations. *State, ex rel. The Repository,* v. *Unger* (1986), 28 Ohio St. 3d 418, 421, 28 OBR 472, 475, 504 N.E. 2d 37, 40. Proceedings may be closed in rare circumstances, and only for cause shown that outweighs the value of openness. *Press-Enterprise Co.* v. *Superior Court* (1984), 464 U.S. 501.

Appellant claims that it was contrary to his "ultimate life/liberty interest" to allow the press and public to attend voir dire. However, appellant has failed to demonstrate prejudice, or to discredit the trial judge's finding that voir dire had revealed "nothing that would be so embarrassing that there is a further need for sequestration." In the absence of such a showing, the strong presumption in favor of an open public trial is controlling. *Press-Enterprise, supra,* at 509-510. We reject appellant's seventh proposition of law.

## VII

### Admission of Victim's Taped Statement

In his fourteenth proposition of law, appellant challenges the admissibility of the tape recording of

___

[6] Even if we were to reverse the death sentence based on this issue, appellant's conviction would not be affected. See *Lockhart* v. *McCree* (1986), 476 U.S. 162.

Ralph Harris, Jr.'s statement to Detective Shuster.

Harris gave the statement about half an hour to forty-five minutes after the stabbing. Harris was "very agitated" and "in serious pain." Harris was still under the stress of the stabbing and "had not calmed down." Over defense objection, the tape was admitted as an excited utterance under Evid. R. 803(2) and played to the jury.[7]

To be admissible under Evid. R. 803(2) as an excited utterance, a statement must concern "some occurrence startling enough to produce a nervous excitement in the declarant," which occurrence the declarant had an opportunity to observe, and must be made "before there had been time for such nervous excitement to lose a domination over his reflective faculties. * * *" *Potter* v. *Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E. 2d 140, paragraph two of the syllabus, quoted in *State* v. *Wallace* (1988), 37 Ohio St. 3d 87, 89, 524 N.E. 2d 466, 469. Appellant does not dispute that the statement concerns his attack on Harris, that Harris had an opportunity to observe the event, or that being stabbed in the liver is an "occurrence startling enough to produce a nervous excitement * * *." He does dispute the trial court's finding that Harris was still in a state of nervous excitement when the statement was made.

Harris made his statement while doctors were treating him. Clearly, he was agitated over the stabbing and the resultant need for emergency medical care, as both Detective Shuster's testimony and the sound of Harris's voice on the tape demonstrate. There was ample evidence to support the trial court's finding that the statement was admissible as an excited utterance. Accordingly, we reject appellant's fourteenth proposition of law.

## VIII
### Voluntary Manslaughter as a Lesser Included Offense

In his fifth proposition of law, appellant argues that the trial court should have given an instruction on voluntary manslaughter as a lesser included offense. The court gave an instruction on the lesser included offense of murder, but did not give a requested voluntary manslaughter instruction.

"Voluntary manslaughter" is defined in R.C. 2903.03 as knowingly causing the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force * * *." We have previously held that voluntary manslaughter is a lesser included offense of murder, and that a trial court commits reversible error by failing to give an instruction when the elements of manslaughter are raised by the evidence. *State* v. *Solomon* (1981), 66 Ohio St. 2d 214, 20 O.O. 3d 213, 421 N.E. 2d 139. The persuasiveness of the evidence does not control; the instruction must be given if "under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater

---

[7] The tape could not be admitted under Evid. R. 804(B)(2) as a statement under belief of impending death. There is no indication that Harris believed death was imminent, or was even aware that his condition might be life-threatening. In response to a question from Det. Shuster, he stated that he did not know the seriousness of his injuries.

offense and guilty of the lesser offense * * *." *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382, 388, 18 O.O. 3d 528, 532, 415 N.E. 2d 303, 308.

At trial, appellant argued that being told on the phone by Elba Ortiz that Ralph Harris was sleeping with her constituted "sufficient provocation" to require a voluntary manslaughter instruction. Even if we were to accept this questionable argument, appellant had more than sufficient time to cool down after the telephone conversation was completed. The trial court therefore properly denied the instruction.

Appellant's present counsel appears to have abandoned this argument, and now urges that a voluntary manslaughter instruction was required because appellant's intoxication rendered him unable to form the specific intent required for aggravated murder and murder. This is a reformulation of the diminished capacity defense which appellant presents in his first proposition of law, and which we have already determined to be devoid of merit. Accordingly, we reject appellant's fifth proposition of law.

IX

Miscellaneous Issues

In his ninth, tenth, fifteenth, and sixteenth propositions of law, appellant contests several alleged errors occurring in the guilt phase of his trial. These issues were not raised in the court of appeals, and have therefore been waived. *Williams, supra; Reasonover, supra.* Additionally, our review of the record reveals no basis upon which to invoke the plain error rule and reverse appellant's conviction.

In his fourth, eleventh, thirteenth and nineteenth propositions of law, appellant asks that we reverse his death sentence based on several alleged errors in the penalty phase of his trial. In view of our reversal of appellant's death sentence, these issues are moot.

In his seventeenth, eighteenth, twentieth and twenty-first propositions of law, appellant attacks the constitutionality of Ohio's capital punishment scheme. These arguments have been rejected in previous cases. See *State* v. *Spisak* (1988), 36 Ohio St. 3d 80, 521 N.E. 2d 800; *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795; *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264. In addition, appellant has no standing to attack the death penalty because we have vacated his death sentence. Accordingly, we reject these propositions of law.

X

Conclusion

For the foregoing reasons, we vacate appellant's felony murder conviction, affirm his remaining convictions for aggravated murder with prior calculation and design and aggravated burglary, and we vacate his sentence of death. We remand the case for imposition of a life sentence.

*Judgment affirmed in part,*
*reversed in part,*
*and cause remanded.*

MOYER, C.J., SWEENEY, HOLMES and WRIGHT, JJ., concur.

MOYER, C.J., concurs separately.

DOUGLAS and RESNICK, JJ., separately dissent.

MOYER, C.J., concurring. I concur separately for two reasons. The first is

to add my voice to that of Justice Resnick who, in her dissent, urges the United States Supreme Court to reconsider its opinions in *Booth* v. *Maryland* (1987), 482 U.S. 496, and *South Carolina* v. *Gathers* (1989), 490 U.S. ____, 104 L. Ed. 2d 876, 109 S.Ct. 2207, in order to give the state courts clear direction with respect to the admissibility of victim impact statements in the sentencing phase of a death penalty case. The fact that the majority and two dissenters in this case all interpret the opinions and footnotes in *Booth* and *Gathers* differently demonstrates the uncertainty of the law in this area.

The second reason I concur separately is to dispel any notion that "* * * today's majority creates a constitutional ban on the admission of *any* victim impact evidence * * *," as asserted in the dissent by Justice Douglas in this case. Footnote 10 in *Booth,* referred to in Justice Douglas's dissent simply does not apply to the facts in this case, and the majority opinion, therefore, obviously should not be characterized to apply to facts referred to in footnote 10. Under the holdings of both *Booth* and *Gathers* referred to in the majority opinion, we simply have no discretion, when presented with the facts in this case, to decide that the use of the victim impact statement herein did not violate those holdings.

We can only hope that the United States Supreme Court will soon provide us with an opinion, free of footnotes with statements of substantive law, that will permit the greater use of victim impact statements in the sentencing phase of death penalty cases.

DOUGLAS, J., dissenting. By stating "* * * the *Booth* [v. *Maryland* (1987), 482 U.S. 496] court held that the admission of victim impact evidence in the sentencing phase of a capital jury trial is constitutional error," and "* * * *Booth* prohibits consideration of victim impact evidence," today's majority creates a constitutional ban on the admission of *any* victim impact evidence and, thereby, the majority contravenes the express language in *Booth.*

If *Booth* is viewed as creating a constitutional ban on the admission of victim impact evidence, how can that view be justified in light of footnote 10 in *Booth,* which provides:

"Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime. Facts about the victim and family also may be relevant in a noncapital criminal trial. Moreover, there may be times that the victim's personal characteristics are relevant to rebut an argument offered by the defendant. See, *e.g.,* Fed. Rule Evid. 404(a)(2) (prosecution may show peaceable nature of victim to rebut charge that victim was aggressor). The trial judge, of course, continues to have the primary responsibility for deciding when this information is sufficiently relevant to some legitimate consideration to be admissible, and when its probative value outweighs any prejudicial effect. Cf. Fed. Rule Evid. 403." *Id.* at 507-508.

Obviously, *Booth,* by its own terms, does not create a constitutional ban on the admission of victim impact evidence. Therefore, in the case at bar, it is error for the majority to create such a ban by relying on *Booth.* In my view, *Booth* stands for the proposition that the use of victim impact evidence in the sentencing phase of a capital

trial is constitutionally impermissible *only* when that evidence creates a substantial risk that the sentencing decision will be based upon arbitrary or irrelevant considerations.

*South Carolina* v. *Gathers* (1989), 490 U.S. ____, 104 L. Ed. 2d 876, 109 S. Ct. 2207, was decided shortly after *Booth*. In the case at bar, the majority views *Gathers* as a mere application of the constitutional standards announced in *Booth*. I disagree. *Gathers* further explained the tenth footnote in *Booth*. Therefore, *Gathers* should have dispelled any belief that *Booth* created a constitutional ban on the use of victim impact evidence, or that the use of any such evidence is constitutionally impermissible.

For purposes of the present appeal, the majority has apparently dismissed *Gathers* and certain relevant language in *Booth*. In so doing, the majority states: "* * * we find no grounds on which to distinguish *Booth* and *Gathers,* and we are thus compelled to follow those cases, vacate the sentence of death, and remand for imposition of a life sentence * * *." Today's majority opinion does *not* follow *Booth* or *Gathers*.

In the case *sub judice,* the evidence of appellant's guilt is overwhelming. Appellant requested that Harris stop dating Elba Ortiz. When Harris apparently refused to comply with the request, appellant stated that he "was going to waste" Harris. Approximately one hour later, appellant repeated his threats stating: "I still say I'm going to have to waste you. * * * I don't do it fair, * * * but I'm going to waste you."

Appellant knew Harris was spending the night with Elba Ortiz at Ortiz's apartment. Harris and Ortiz were awakened by a noise at the door. Harris got up to investigate. Appellant stabbed Harris with a knife and at-tempted to kill Ortiz. Harris died after describing appellant's attack on him. Appellant's shirt had blood stains matching Harris's blood type. Police found appellant's fingerprints on the storm windows through which he entered the apartment. Appellant's shoe heel matched a hole in the bedroom door of Ortiz's apartment. Appellant admitted going to Ortiz's apartment.

In my judgment, the proof of appellant's guilt is overwhelming and, further, it is my judgment that appellant would have been sentenced to death regardless of the victim impact evidence. Accordingly, I find that if the admission of the victim impact evidence was error, that error was harmless beyond a reasonable doubt. See *State* v. *Williams* (1983), 6 Ohio St. 3d 281, 6 OBR 345, 452 N.E. 2d 1323, paragraph six of the syllabus. It is also interesting to note that appellant objected to some, but not all, of the victim impact evidence, thereby waiving error, if any, involved. See, *e.g., State* v. *Broom* (1988), 40 Ohio St. 3d 277, 288-289, 533 N.E. 2d 682, 695-696. Because *Booth* and *Gathers* prohibit the admission of victim impact evidence *only* when that evidence creates a substantial risk that the capital sentencing decision will be based upon arbitrary or irrelevant considerations, I would affirm the sentence of death since the evidence in the present case created no such risk.

Unfortunately, the majority opinion in the case at bar leaves no room to even consider whether the error was harmless and thus nonprejudicial to appellant's rights. By what the majority views as "following" *Booth* and *Gathers,* the majority opinion creates an automatic vacating of the death sentence *any time* victim impact evidence is admitted in the sentencing phase of a capital jury trial. Because I

do not believe that the United States Supreme Court intended such a result, I urge that honorable court, should this matter be appealed, to review this case which so plainly misconstrues both *Booth* and *Gathers*.

ALICE ROBIE RESNICK, J., dissenting. Today's holding, as well as the holdings in *Booth* v. *Maryland* (1986), 482 U.S. 496, and *South Carolina* v. *Gathers* (1989), 490 U.S. ___, 104 L. Ed. 2d 876, 109 S. Ct. 2207, is a step backward in the sentencing process in Ohio and the country. It was not until 1980 that Ohio enacted legislation concerning victims and the effect the crimes had on their lives. R.C. 2947.051 provides "[i]n all criminal cases in which a person is convicted * * * the court shall, prior to sentencing the offender, order the preparation of a victim impact statement by the department of probation." Prior to this time victims were not considered at all during the sentencing process. This has been changed by the foregoing legislation. As Justice Scalia stated in his dissent in *Booth, supra,* at 520, "citizens have found one sided and hence unjust the criminal trial in which a parade of witnesses comes forth to testify to the pressures beyond normal human. experience that drove the defendant to commit his crime, with no one to lay before the sentencing authority the full reality of human suffering the defendant has produced—which (and *not* moral guilt alone) is one of the reasons society deems his act worthy of the prescribed penalty."

The majority in *Booth, supra,* at 504, stated, "[i]n such a case, it is the function of the sentencing jury to 'express the conscience of the community on the ultimate question of life or death.' " How can this be done without the sentencing authority knowing all the facts surrounding both the defendant and the victim? Further, the conscience of the community cannot properly be expressed if the sentencing authority lacks knowledge of the effect the defendant's crime had on the community and especially the family, friends and associates of the victim. I am not intimating that such information should be provided to the factfinders in the guilt phase of the trial. But in the penalty phase a statement prepared by the department of probation should be included and not be deemed prejudicial.

In light of recent victim rights legislation it is time that both *Booth, supra,* and *Gathers, supra,* be reconsidered so that when the sentencing authority is making that determination of whether or not to impose the death penalty it will be on an equal footing with the sentencing process in all other criminal cases. Victim impact statements are appropriate in the penalty phase of the proceedings especially in view of the fact that aggravated murder is the most heinous crime that can be committed. Why should the rights of a victim be less important? Based upon the majority's holding the sentence of life or death is determined in a vacuum. The sentencing jury is not permitted to know anything about the personal characteristics of the victim. An appropriate, fair and just determination cannot be made without this information.

Based upon the foregoing I would find that the admission of the victim impact statement was not prejudicial error and I would therefore affirm the judgment of the court of appeals in its entirety.