OPINION
{¶ 1} Appellant Crystal Anderson Starcher appeals from her convictions, in the Stark County Court of Common Pleas, for one count of aggravated murder, with a death penalty specification, and one count of aggravated arson. The following facts give rise to this appeal.
 {¶ 2} In the early morning hours of December 11, 2002, the Massillon Fire Department responded to a fire at the Anderson residence. Mary Snyder, the decedent's mother and appellant's grandmother, also arrived on the scene of the fire after she received a telephone call, from appellant, informing her of the fire. Ms. Snyder noticed that appellant's mother, Vickie Anderson; appellant's brother, Jonathan Anderson; appellant's boyfriend, Donald Starcher; and appellant were standing outside of the burning home fully dressed in winter clothing.
 {¶ 3} After extinguishing the fire, the fire department found the body of Earnest Dean, in a bedroom, on the second floor of the residence. The decedent had first, second and third degree burns on forty percent of his body. The decedent died as a result of thermal burns, smoke inhalation and carbon monoxide poisoning.
 {¶ 4} The fire department labeled the fire as "suspicious" and contacted Captain Jerry Layne to conduct an arson investigation. Captain Layne arrived on the scene. As part of Captain Layne's investigation, he talked to the family members. Appellant told Captain Layne the fire started when the dog knocked over a lantern. The family was using a lantern because the electricity had been turned off that day. Captain Layne observed pour patterns, on the floor, which were especially deep in the kitchen area.
 {¶ 5} Approximately one week later, Captain Layne returned to the residence, with several detectives from the Massillon Police Department, and Mark Casalinova, a fire investigator hired by the insurance company. Vickie Anderson was also present and gave the investigating parties written consent to search the residence. Upon examining the stove in the kitchen, the investigators discovered a blanket stuffed under the top of the stove. Thereafter, the investigators labeled the fire as an "intentionally set arson fire."
 {¶ 6} Subsequently, Detective Mizeres interviewed appellant and her family members on December 23, 2002. Appellant's interview lasted approximately one half hour. Detective Mizeres determined that appellant made no incriminating statements, during the interview, and was released. On March 19, 2003, appellant and her family returned to the police department for another interview. Prior to this date, appellant married Donald Starcher.
 {¶ 7} Detective Bobby Grizzard conducted the interview of appellant. Detective Grizzard asked appellant whether she had any knowledge of how the fire started or who may have been responsible for the fire. Appellant informed Detective Grizzard that her brother, Jonathan Anderson, set the fire. Upon learning this information, Detective Grizzard left the room and informed the other investigators of appellant's statement. Thereafter, Detective Grizzard returned to the room, with a tape recorder, and asked appellant to give a taped statement. Prior to making the taped statement, Detective Grizzard read appellant herMiranda rights. Appellant also signed a "Waiver of Constitutional Rights" form.
 {¶ 8} After waiving her rights, Detective Grizzard proceeded to question appellant, about the fire, for forty-seven minutes. At that point, the interview terminated and appellant took a break. During the break, Detective Grizzard spoke to several of the detectives and decided to again interview appellant. Detective Grizzard advised appellant of her Miranda rights and appellant indicated she understood her rights. In the second statement to Detective Grizzard, appellant directly implicated herself in the fire. The second interview lasted approximately twelve minutes.
 {¶ 9} On April 17, 2003, the Stark County Grand Jury indicted appellant for one count of aggravated arson and one count of aggravated murder, with a death penalty specification.[1]
Appellant entered a plea of not guilty. Prior to trial, appellant filed a motion to suppress statements she made to Detective Grizzard. Following a hearing, the trial court denied appellant's motion.
 {¶ 10} The case proceeded to a jury trial on December 12, 2003. The first witness the defense called at trial was Dr. Robert Devies, a clinical psychologist. Through the testimony of Dr. Devies, the defense sought to establish that appellant was not capable of forming the necessary criminal intent required to commit the crimes of aggravated murder, that she had a submissive, passive personality and that due to her personality, she was at the mercy of her mother. The trial court did not permit Dr. Devies to testify on the basis that diminished capacity is not a defense, under Ohio law, and expert testimony was not needed to establish that appellant's mother orchestrated the murder of her husband.
 {¶ 11} Following deliberations, the jury found appellant guilty as charged in the indictment. On January 5, 2004, the trial court sentenced appellant to life imprisonment, with parole eligibility after serving twenty-five years on the charge of aggravated murder, with a death penalty specification, and ten years on the charge of aggravated arson. The trial court ordered the sentences to be served concurrently.
 {¶ 12} Appellant timely filed a notice of appeal and sets forth the following assignments of error for our consideration:
 {¶ 13} "I. The trial court erred in admitting into evidence the oral and tape recorded statements of the accused.
 {¶ 14} "II. The trial court erred in finding the accused statements to police, admitted into evidence were (sic) knowingly, voluntarily and intelligently.
 {¶ 15} "III. The trial court erred in not allowing into evidence the testimony of Dr. Robert K. Devies, offered on behalf of the accused."
 I {¶ 16} In her First Assignment of Error, appellant contends the trial court erred when it admitted into evidence the oral and taped statements she made to Detective Grizzard. We disagree.
 {¶ 17} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See, State v. Fanning (1982), 1 Ohio St.3d 19;State v. Klein (1991), 73 Ohio App.3d 486; State v. Guysinger
(1993), 86 Ohio App.3d 592.
 {¶ 18} Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See State v. Williams
(1993), 86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any give case. State v. Curry (1994), 95 Ohio App.3d 93;State v. Claytor (1993), 85 Ohio App.3d 623; Guysinger,
supra.
 {¶ 19} In the case sub judice, appellant maintains the trial court failed to follow the law, as set forth in the case ofMissouri v. Seibert (2004), 124 S.Ct. 2601, and therefore, committed an error at law when it denied appellant's motion to suppress. Specifically, appellant maintains the facts of this case present a classic example of the "question-first" tactic used by police during interviews. The United States Supreme Court recently condemned this practice in Seibert.
 {¶ 20} The defendant's son, in Seibert, had cerebral palsy and died in his sleep. Id. at 2605. The defendant feared that charges would be brought against her for neglect due to the bedsores on his body. Id. In response to her fears, the defendant, two of her teenage sons and two of their friends devised a plan to conceal the facts surrounding the death of the defendant's son by incinerating his body in the course of burning the family's mobile home. Id. It was also decided that a mentally ill teenager living with the family would be left in the mobile home to die in order to avoid the appearance that the defendant's son had been unattended. Id.
 {¶ 21} Five days after the fire, the defendant was arrested and transported to an interview room at the police station. Id. at 2606. The officer questioned the defendant, without herMiranda warnings, for approximately thirty to forty minutes. Id. After the defendant admitted that she knew the mentally ill teenager was meant to die in the fire, she was given a twenty-minute coffee and cigarette break. Id. Following the break, the officer turned on a tape recorder, gave the defendant her Miranda warnings and obtained a signed waiver of her rights. Id. The defendant admitted to killing the mentally ill teenager in the fire. Id.
 {¶ 22} After the defendant was charged with first-degree murder, she sought to exclude both her prewarning and postwarning statements. Id. The trial court suppressed the prewarning statement but admitted the responses given after the Miranda
warnings. Id. Thereafter, following a jury trial, the defendant was convicted of second-degree murder. Id. On appeal, the court of appeals affirmed the trial court's decision. Id. The Supreme Court of Missouri reversed the court of appeals on the basis that the second statement was the product of the invalid first statement. Id. The United States Supreme Court granted certiorari. Id. at 2607.
 {¶ 23} The Court began its analysis by noting that "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 2610. Thus, "[t]he threshold issue when interrogators question first and warn later is * * * whether it would be reasonable to find that in these circumstances the warnings could function `effectively' as Miranda requires." Id. Accordingly, "* * * when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and `depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Id. at 2611, quoting Moran v. Burbine
(1986), 475 U.S. 412, 424.
 {¶ 24} The Court proceeded to list a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object. Id. at 2612. These facts are as follows:
 {¶ 25} "The completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id.
 {¶ 26} The state maintains the record contains no evidence that Detective Grizzard applied the question-first tactic when he questioned appellant. The record does reveal that Detective Grizzard questioned appellant prior to administering Miranda
warnings. However, the facts of the case sub judice are distinguishable from the Seibert decision in that appellant did not implicate herself, in the crime, prior to receiving Miranda
warnings. Detective Grizzard, on cross-examination, admitted that he asked appellant the following questions: (1) who she was willing to protect, Tr. Suppression Hrng. at 45-46; (2) whether she would protect her mother if her mother was involved in the fire, Id. at 46; (3) whether she had a secret, Id. at 46-47; (4) whether she would be willing to protect any other person, Id. at 47; (5) whether appellant talked to anyone on the telephone about the secret, Id. at 48-49; and (6) whether her brother started the fire, Id. at 51.
 {¶ 27} Appellant's responses to these questions did not implicate her in the fire. At the most, her responses indicated that she had some knowledge concerning how the fire started and who started it. Thus, although Detective Grizzard questioned appellant once without Miranda warnings and twice withMiranda warnings, the facts of this case differ from Seibert
because appellant did not implicate herself in the crime during the prewarning questioning. Accordingly, the Seibert decision is not applicable to the case sub judice and the trial court did not commit an error of law when it denied appellant's motion to suppress.
 {¶ 28} Appellant's First Assignment of Error is overruled.
 II {¶ 29} Appellant maintains, in her Second Assignment of Error, the trial court erred when it determined her statements to police were made knowingly, voluntarily and intelligently. We disagree.
 {¶ 30} Appellant contends the state made no attempt to determine whether she understood the rights she was asked to waive prior to recording her statements. Specifically, appellant points to the fact that Detective Grizzard only took a total of three minutes combined, for both recorded statements, to read the form to appellant and ascertain whether she understood her rights. Appellant had no previous experience with the legal system. Also, Detective Grizzard never determined whether appellant could read or write, her level of education or whether she was under the influence of drugs or alcohol. Based upon these facts, appellant concludes the warnings were inadequate and the recorded statements were involuntary.
 {¶ 31} The admissions and confessions of juveniles require special attention. Haley v. State of Ohio (1948), 332 U.S. 596. In the case of In re Gault (1967), 387 U.S. 1, the United States Supreme Court recognized constitutional rights, such as the right to counsel and the Fifth Amendment privilege against self-incrimination, are applicable to juveniles. Pursuant toMiranda v. Arizona (1966), 384 U.S. 436, statements resulting from custodial interrogations are admissible only after a showing the procedural safeguards have been followed. Custodial statements are not admissible unless the state can prove the defendant knowingly, voluntarily and intelligently waived his or her Miranda rights.
 {¶ 32} In the case of In re Gault, the Unites States Supreme Court stated:
 {¶ 33} "We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique — but not in principle — depending upon the age of the child and the presence and competence of parents. * * * If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."In re Gault at 55.
 {¶ 34} In Ohio, in order to determine whether a juvenile has waived his or her rights to remain silent and have the assistance of counsel, we must examine the totality of the circumstances surrounding the waiver. In re Watson (1989), 47 Ohio St.3d 86,89. This approach requires us to inquire into all the circumstances surrounding the interrogation. This includes the age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. State v. Edwards (1976),49 Ohio St.2d 31, paragraph two of the syllabus, reversed on other grounds, (1978), 438 U.S. 911. The burden of showing admissibility is on the prosecution. Brown v. Illinois (1975), 422 U.S. 590, 604.
 {¶ 35} Appellant gave two recorded statements on March 19, 2003. Appellant made the first statement at 5:03 p.m., in the Massillon Police Department's Detective Bureau. Detective Grizzard explained appellant her rights as follows:
 {¶ 36} "GRIZZARD: * * * Crystal, prior to this tape being read, ah, being turned on I read you this form here. Is that correct?
 {¶ 37} "APPELLANT: Yes.
 {¶ 38} "GRIZZARD: It says I'm a Police Officer. I warn you that anything you say will be used in a Court of law against you; That you have an absolute right to remain silent; That you have the right to advice of a lawyer before and the presence of a lawyer here with you during questioning, and That if you cannot afford a lawyer, one will be furnished for you free before any questioning if you desire. Did you also state here that you understood these rights?
 {¶ 39} "APPELLANT: Yes.
 {¶ 40} "GRIZZARD: And did you put that your intials (sic) there?
 {¶ 41} "APPELLANT: Yes.
 {¶ 42} "GRIZZARD: Did you also write `yes' to the "You wish to talk at this time with out a lawyer being present" Is that correct?
 {¶ 43} "APPELLANT: Yes.
 {¶ 44} "GRIZZARD: At the bottom here did you signed (sic) after I read `I have read the statement of my rights shown above, I understand what my rights are and when I answer a question or make a statement, I do not want a lawyer and understand and know what I'm doing. No promises or threats have been made to me, and no pressure of any kind has been used against me.' Is this the form you've always, that you have already signed. (sic)
 {¶ 45} "APPELLANT: Yes."
 {¶ 46} Appellant made a second statement, on March 19, 2003, at 9:34 p.m., at the detective bureau. Detective Grizzard again explained appellant her rights as follows:
 {¶ 47} "GRIZZARD: * * * I'm gonna read you your rights again as I've done on 2 previous occasions. Um, the form here says that I'm a police officer. I warn you that anything you say will be used in a court of law against you; that you have an absolute right to remain silent; that you have the right to advice of a lawyer before and the before (sic) and the presence of a lawyer here before and the presence of a layer (sic) here with you during questioning and that if you cannot afford a lawyer, one will be furnished for you free before any questioning if you desire. You understand that?
 {¶ 48} "APPELLANT: Yes.
 {¶ 49} "GRIZZARD: And I'm gonna have you um, answer either yes or no on line 1 and then put you (sic) initials next to that. Then on line 2 it says, do you wish to talk with us at this time with out a lawyer being present? And your initials. And at the bottom it says, I've read the statement of my rights shown above, I understand what my rights are, I'm willing to answer the questions and make a statement, I do not want a lawyer, I understand and know what I'm doing, no promises or threats have been made to me and no pressure of any kind has been used against me. And if that be the case can you sign your name there. * * *"
 {¶ 50} In order to determine whether appellant knowingly, voluntarily and intelligently waived her rights, we will review the factors contained in State v. Edwards, supra. Appellant was sixteen at the time of the taped interviews. As noted above, appellant had no prior criminal experience. Appellant was married at the time of the interviews in March. A review of the above portions of the transcripts indicate appellant was mentally capable of giving a taped statement. Appellant provided Detective Grizzard her name, age, social security number, date of birth, date of marriage and other information about her family.
 {¶ 51} Appellant was interviewed twice on the same evening. However, the interviews were not excessive in length or intensity although appellant spent a total of six and one-half to seven hours at the detective bureau. The record indicates the first interview, at 5:03 p.m., lasted forty-seven minutes. The second interview, at 9:34 p.m., lasted twelve minutes. Appellant left the detective bureau at approximately 10:30. Tr. Suppression Hrng. at 38. The record also indicates appellant was not physically deprived or mistreated. Appellant was not restrained at the detective bureau. Appellant was permitted to use the restroom, purchase pop from the vending machine and smoke.
 {¶ 52} Based upon the above evidence, we conclude the state met its burden in establishing that appellant knowingly, voluntarily and intelligently waived her Miranda rights.
 {¶ 53} Appellant's Second Assignment of Error is overruled.
 III {¶ 54} In her Third Assignment of Error, appellant maintains the trial court erred when it did not allow the testimony of Dr. Robert Devies into evidence. We disagree.
 {¶ 55} We have reviewed the proffered testimony of Dr. Devies. Dr. Devies' testimony indicates appellant's mother was more culpable for the crime than appellant because appellant's mental status would not allow her to form the specific intent to commit the crimes of aggravated murder and aggravated arson. The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 56} The trial court did not abuse its discretion when it excluded Dr. Devies' testimony because Ohio does not recognize the defense of diminished capacity. State v. Huertas (1990),51 Ohio St.3d 22, 27. "The `diminished capacity' defense has been defined by one commentator as arising when a `sane defendant's mental abnormality at the time of the crime prevented him from entertaining the specific mental state prescribed by statute. * * *' Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage (1977), 77 Colum.L.Rev. 827, 828. If asserted successfully in a jurisdiction where it is recognized, it `results in the reduction of the offense to one with a lesser maximum penalty which does not require proof of the specific intent at issue.' Id. at 829."Huertas at fn. 5.
 {¶ 57} However, Ohio law does permit expert psychiatric testimony unrelated to the insanity defense, in the mitigation phase of a death penalty case, for the purpose of showing that the defendant lacked the capacity to form the specific mental state required for a particular crime. Id. at 28. Since appellant did not seek to introduce this testimony during the mitigation phase of a capital trial, we conclude the trial court did not abuse its discretion when it excluded the testimony of Dr. Devies.
 {¶ 58} Appellant's Third Assignment of Error is overruled.
 {¶ 59} For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.
Wise, J., Gwin, P.J., and Boggins, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed.
Costs assessed to Appellant.
[1] Appellant was not subject to the death penalty because she was a minor at the time she committed the murder.