Defendant-appellant Todd Thompson appeals from his convictions of felonious assault and murder which were entered after a jury trial in the Jefferson County Common Pleas Court. For the following reasons, appellant's convictions are affirmed.
 FACTS
On April 8, 1997, Annette Bingham and Angela Moore picked up appellant at his friend's house where he had been drinking alcohol. Upon their return to Annette's apartment, appellant was left in the car since he had passed out and would not wake up. Later, Annette asked Ms. Moore to watch her baby while she went out. Shortly thereafter, appellant woke up and entered the apartment looking for Annette. Ms. Moore told appellant that Annette had left with two men. Just then, Annette called her apartment. According to Ms. Moore, appellant got on the phone and told Annette that if she did not return soon he would give her "an ass beating." (Tr. 58). Appellant then dialed "*69" and repeated his warning to Annette. Annette returned approximately twenty-five minutes later, around 7:30 p.m. At this time, appellant and Annette argued and then went outside.
Once in the parking lot, the argument escalated. Angela Martin, who was in the parking lot, stated that she watched appellant punch Annette in the head causing Annette to fall to the ground where appellant kicked her in the head and the stomach. Appellant then began slamming Annette's head off of the pavement and yelling about being left in the car. Ms. Martin then saw appellant pull Annette into a truck where he appeared to be repeatedly hitting her as she begged him to stop.
Eulis Allen, appellant's second cousin, testified that when he saw appellant hitting Annette, he went outside and tried unsuccessfully to calm appellant down. It appears that in the meantime, Ms. Martin had entered her apartment and called apartment security. She then watched appellant drag Annette across the parking lot and throw her over a fence. He began slamming her head into the grass and kicking her head and stomach again. Eventually, appellant took Annette inside.
Once inside, Ms. Moore heard Annette beg appellant not to hit her in front of her baby. Appellant then dragged Annette into the bedroom by her hair. Ms. Moore then listened to Annette screaming for appellant to stop hitting her. Finally, a security guard and two apartment managers entered Annette's apartment. In the bedroom, they witnessed appellant drop onto Annette's stomach with one knee. It appeared that Annette was too weak to put up any resistance. Appellant continued to punch Annette twice in the side of the head while yelling, "I'll kill you fucking bitch. You left me in that car to die. I'll fucking kill you first." (Tr, 99). Appellant ultimately obeyed the men's orders to stop. The police arrived and arrested appellant. An ambulance also arrived but Annette refused treatment. Annette then allegedly went across the hall to Amanda Vargo's apartment and told her what had happened.
A couple hours later, an ambulance was asked to return to Annette's apartment to transport her to the hospital. She was examined at Trinity Medical Center East in Steubenville and released. However, two days later on April 10, she was returned to the hospital by ambulance. Soon, her right side was paralyzed. When a CAT scan showed brain swelling, she was life-flighted to Allegheny General Hospital in Pittsburgh. On April 14, Annette died of severe cerebral edema due to blunt force head trauma.
Appellant was indicted on charges of felonious assault and aggravated murder. A jury trial commenced on June 23, 1997. The next day, the jury found appellant guilty of felonious assault and murder, rather than the charged aggravated murder. On July 1, appellant was given consecutive sentences of fifteen years to life for the murder and eight years for the felonious assault. The within timely appeal followed.
 ASSIGNMENT OF ERROR NO. 1
Appellant sets forth three assignments of error, the first of which asks:
 "DID THE COURT COMMIT REVERSIBLE ERROR IN PERMITTING PREJUDICIAL HEARSAY EVIDENCE TO BE HEARD BY THE JURY?"
The week before trial, the state filed an affirmative motion inlimine asking that Ms. Vargo be permitted to testify as to what Annette told her happened on the night of the incident. The state argued that Annette's statements to Ms. Vargo were excited utterances. The court wanted to hear foundational testimony before ruling. At trial, appellant objected to Ms. Vargo's testimony regarding what Annette told her. The court eventually overruled appellant's objection. Ms Vargo then testified to the following:
 "A: She called home and he told her to come home. She didn't get there — she got there but it was later than he wanted she said. And that he threw her down outside and was hitting her outside and that someone broke it up and they went inside.
Q: Did she describe what happened inside?
 A: He hit her when she got in the door she said. She said `Please don't hit me in front of the baby.' The baby was there. And he drug her back into the bedroom.
 Q: And when they go back to the bedroom did she describe how he beat her?
A: Yes.
Q: Please explain that to the jury.
A: She said he punched her.
 [Objection by defense counsel renewed and overruled]
 A: Kicked her, head butted her, jumped off the bed and landed on her head with his knees and choked her till she was passed out." (Tr. 131-132)
Appellant claims that the above passage was inadmissible hearsay testimony which prejudiced his defense. Hearsay is an out of court statement offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible. Evid.R. 802. One exception to the ban on hearsay is an excited utterance or a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. Evid.R. 803(2). A court's decision on whether a declaration should be admitted under the excited utterance exception to the hearsay rule shall not be reversed unless it is unreasonable. State v. Taylor
(1993), 66 Ohio St.3d 295, 304-305.
In the case at bar, Annette had just been severely beaten. Ms. Vargo testified that Annette arrived at her door crying before the emergency personnel had even left the apartment building. She described Annette as being hysterical. These facts adequately establish that the trial court's decision to admit Annette's declarations as excited utterances was reasonable.
Because Annette was hysterical, Ms. Vargo asked her, "What happened?" Consequently, appellant contends that an excited utterance cannot be in response to a question. However, the Supreme Court of Ohio has held otherwise. State v. Wallace
(1988), 37 Ohio St.3d 87. "[S]tatements made in response to questions may still be under the stress of the event." Id. at 92. More specifically, the Court declared:
 "Accordingly, we hold that the admission of a declaration of an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." Id. at 93.
Ms. Vargo's question to Annette, "What happened?," was neither coercive nor leading. See Id. at 92. It merely served to facilitate Annette's expression of the reason for her hysterical and battered state. The two word question also did not serve to calm Annette so as to diminish her nervous excitement. Thus, the court properly admitted Annette's statements to Ms. Vargo as excited utterances. Furthermore, Ms. Vargo's testimony was not prejudicial to appellant's defense as other witnesses testified to the beating received by Annette at the hands of appellant. Accordingly, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. 2
Appellant's second assignment of error provides:
 "SHOULD THE COURT HAVE CHARGED THE JURY ON CRIME OF VOLUNTARY MANSLAUGHTER?"
The trial court instructed the jury on aggravated murder, murder and voluntary manslaughter. The verdict form contained all three of these homicides from which the jury could choose. Voluntary manslaughter is explained in R.C. 2903.03 as follows:
 "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *."
A proper jury instruction would incorporate every part of the statute. See 4 Ohio Jury Instructions (1997), Section 503.02, at 122. However, in the case at hand, the court's jury instructions merely explained voluntary manslaughter as a homicide that is done knowingly. Appellant did not object to the jury instructions, but he now claims that the trial court erroneously failed to inform the jury about critical issues such as provocation. Appellant correctly asserts that the trial court's jury instruction was incomplete. Nevertheless, appellant was not entitled to a voluntary manslaughter instruction in the first place.
A defendant is only entitled to a voluntary manslaughter instruction where the evidence presented at trial would reasonably support both an acquittal of the murder charge and a conviction for voluntary manslaughter. State v. Shane (1992),63 Ohio St.3d 630, 632. The defendant must subjectively establish that the victim seriously provoked him to the extent that he was under the influence of sudden passion or a sudden fit of rage.Id. at 634. Objectively, the provocation "must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. Also, if a reasonable person would be provoked, it must be established that such person would not have "cooled off" before acting in response to the provocation.Id. at 633, citing State v. Huertas (1990), 51 Ohio St.3d 22,31-32. If a reasonable jury could not find these factors, then a jury instruction on voluntary manslaughter should not be given.Id. at 638.
In the case before us, there is no evidence that Annette provoked appellant. The testimony established that appellant was angry because Annette left him in the car after he passed out. This is not provocation. Even if it were, a reasonable person would not beat a seventy-nine pound girl who left him in her car in a familiar parking lot in April. Appellant also suggested that he was angry because Annette, whom appellant called his girl, went somewhere with two males. Ms. Moore testified that after appellant expressed his anger to Annette over the phone and threatened her with "an ass beating," he waited approximately twenty-five minutes for her to return. This could reasonably constitute the period during which a reasonable person would have "cooled off."
In conclusion, the objective components of voluntary manslaughter are unsatisfied. A reasonable jury could not have found that a serious provocation existed that would incite a person of reasonable sensibilities into a sudden fit of rage. There existed no provocation that was reasonably sufficient to incite an ordinary person to use deadly force. Thus, appellant was not entitled to a jury instruction on voluntary manslaughter. That he received such an instruction, albeit incomplete, could have only worked in his favor. As such, reversible error does not exist. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. 3
Appellant's third assignment of error queries:
 "WAS THE VERDICT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE?"
Weight of the evidence concerns the greater amount of credible evidence presented in a trial. State v. Thompkins (1997), 78 Ohio St.3d 380,387. A criminal conviction is not against the manifest weight of the evidence unless the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. Id., citing State v. Martin (1983),20 Ohio App.3d 172, 175. Appellant argues that the jury's verdict finding him guilty of murder was against the manifest weight of the evidence because he was too drunk to form the requisite intent for murder.
Murder is the act of purposely causing the death of another. R.C. 2903.02(A). Purposely is defined as specifically intending to cause a certain result. R.C. 2901.22(A). Purpose can be inferred from circumstantial evidence. Voluntary intoxication can negate this intent element of murder. State v. Mitts (1998),81 Ohio St.3d 223, 228. However, intoxication will not negate the element of purpose "merely because the evidence suggests reduced inhibitions, impaired judgment or blurred appreciation by the defendant of the consequences of his conduct." State v. Hicks
(1989), 43 Ohio St.3d 72, syllabus. Because even severe intoxication can coexist with purpose to kill, the mere fact that a defendant was drunk does not require an instruction on intoxication let alone a jury finding of intoxication. See Id. at 74. To warrant an instruction on intoxication, a defendant must be grossly intoxicated and "mentally unable to attend anything."State v. Otte (1996), 74 Ohio St.3d 555, 564.
Appellant does not contest the intoxication instruction but merely the jury's finding that intoxication did not negate his intent. Appellant's evidence of intoxication was the testimony of his brother and a friend both of whom stated that appellant and two other people shared four beers, a bottle of EJ liquor, and two bottles of Wild Irish Rose. Appellant's testimony added twelve more beers to the mix. Thus, testimony established that appellant was drunk the day of the incident and also that he often got that drunk. Ms. Moore admitted that appellant was drunk when she and Annette picked him up from his friend's house.
Appellant testified that he was passed out in Annette's car for an hour and a half. He then went into Annette's apartment and slept more as he waited for Annette to return. Ms. Martin testified that appellant did not appear drunk to her as she watched him repeatedly beat Annette. Mr. Allen testified that he smelled alcohol on appellant when he tried to calm appellant. The apartment manager who ordered appellant to stop beating Annette testified that appellant did not appear drunk.
The jury could find that appellant's testimony was not credible and that he was revealing in his testimony only what he wanted to reveal. He claimed that he did not remember certain things, but he clearly remembered other things in the same time frame. After viewing this evidence, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice by finding that appellant was consciously aware of the circumstances and events that transpired and that he possessed the requisite mental state for murder. It was reasonable for the jury to find that appellant, drunk or not, was not so impaired that he failed to intend his actions. In fact, witnesses heard appellant express his desire to kill Annette as he was beating her. Thus, this argument is without merit.
Lastly, appellant alleges that Trinity Medical Center committed medical malpractice when it released Annette on April 8. Thus, he contends that an intervening force removed his assault from being the cause of Annette's death. The physician who examined Annette on April 8 testified that he does not believe that a CAT scan would have revealed swelling at that time. He stated that Annette passed the physical neurological examination and that she was not confused. Credibility is primarily the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 231. The jury did not clearly lose its way by deciding to believe this physician's testimony.
More importantly, the general rule is that one who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved the victim's life. State v. Johnson
(1978), 56 Ohio St.2d 35, 40. This rule is inapplicable if gross negligence of medical personnel is established to have been an independent, intervening cause. Id. In our case, the cause of death was cerebral edema due to blunt force head trauma. The evidence establishes that appellant inflicted this blunt force head trauma upon Annette. There is no evidence of gross medical malpractice. Thus, the actions of the hospital do not relieve appellant from criminal responsibility. The jury's verdict finding appellant guilty of murder is not against the manifest weight of the evidence.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Cox, P.J., concurs., Donofrio, J., concurs.
APPROVED:
 ___________________________________ JOSEPH J. VUKOVICH, JUDGE