DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Robert Hudson ("Hudson"), appeals from the decision of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} Hudson was the manager and a resident at the Miller Hotel ("the hotel"). Neil Shafer ("Shafer") was a resident at the hotel as well. The two men became involved in a verbal altercation on February 15, 2007, when Hudson asked Shafer to move his vehicle to provide a snow plow with access to the property. Hudson contends that the verbal altercation escalated into a physical fight resulting in Shafer allegedly punching Hudson, cutting his lip. Later in the day, an unknown person was alleged to have kicked in the door of Shafer's room and physically assault him, causing injuries severe enough to require medical attention. During his treatment at a local hospital, Shafer allegedly called a local bar and verbally threatened Hudson. The police told each of them not to have contact with the other. Shafer however, returned to his room at the *Page 2 
hotel late that night or early the next morning to learn that Hudson had removed a space heater from his room. There was a confrontation between the two men in a common area of the hotel and a fight ensued. During the fight, Hudson fatally stabbed Shafer. The police arrived at the scene shortly thereafter. Hudson admitted to police that he stabbed Shafer and the police took him into custody.
 {¶ 3} On March 5, 2007, Hudson was indicted on one count of murder, in violation of R.C. 2903.02(A), a special felony. On June 19, 2007, a supplemental indictment was filed, charging Hudson with an additional count of murder in violation of R.C. 2903.02(B), a special felony, one count of felonious assault in violation of R.C. 2903.11(A)(1), a second degree felony, and one count of felonious assault in violation of R.C. 2903.11(A)(2). Hudson pled not guilty to these charges and on October 29, 2007, the matter proceeded to a bench trial. On November 5, 2007, the trial court found Hudson guilty of murder, felony murder, and felonious assault. For the murder convictions, Hudson was sentenced to two concurrent terms of 15 years to life in prison. For the felonious assault convictions, he was sentenced to two terms of eight years of incarceration. The terms were all to run concurrent. Hudson timely appealed from his convictions, raising one assignment of error for our review.
 II. {¶ 4} Initially we note that Hudson was convicted and sentenced for two murder charges. The Ohio Supreme Court has held that the conviction and sentence on two counts of murder for a single killing violates R.C. 2941.25 and the Double Jeopardy Clauses of the Ohio and United States Constitutions. State v. Huertas (1990), 51 Ohio St.3d 22, at 28. The Court further explained that "where a defendant who kills only one victim is convicted of two aggravated murder counts, the trial court may sentence on only one count." State v. Waddy *Page 3 
(1992), 63 Ohio St.3d 424, 447. In this case, Hudson received two concurrent terms of incarceration for the murder of one victim. While Hudson did not raise this issue below nor did he argue it on appeal, pursuant to Crim. R. 52(B), a plain error or defect that affects a substantial right may be noticed although it was not brought to the attention of the trial court. "A plain error must be obvious on the record, such that it should have been apparent to the trial court without objection." State v. Kobelka (Nov. 7, 2001), 9th Dist. No. 01CA007808, at *2, citing State v. Tichon (1995), 102 Ohio App.3d 758,767. We find that the trial court plainly erred by sentencing Hudson on two murder charges. Therefore, these two sentences are merged, and Hudson is sentenced to one term of 15 years to life for the murder, concurrent with the other parts of the sentence imposed by the trial court judge. Accordingly, this error is hereby corrected. State v.Pless (May 21, 1998), 8th Dist. No. 72281, at *6.
 ASSIGNMENT OF ERROR "[HUDSON'S] CONVICTION IS NOT SUPPORTED BY THE EVIDENCE." {¶ 5} In his sole assignment of error, Hudson contends that his conviction was not supported by the manifest weight of the evidence. He specifically contends that the evidence showed that he acted in self-defense. We do not agree.
 {¶ 6} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). A determination of whether a conviction is against the manifest weight of the evidence does not permit this Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. State v. Love, 9th Dist. No. 21654, 2004-Ohio-1422, at ¶ 11. Rather, *Page 4 
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 7} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 8} Hudson argues that the weight of the evidence supported his claim of self-defense. We do not agree.
 {¶ 9} By claiming self-defense, Hudson "`concedes [that] he had the purpose to commit the act, but asserts that he was justified in his actions.'" State v. Howe (July 25, 2001), 9th Dist. No. 00CA007732, at *2, quoting State v. Barnd (1993), 85 Ohio App.3d 245, 260. Hudson had the burden at trial to prove self-defense by a preponderance of the evidence. Howe, supra, at *2. To meet this burden, Hudson must have demonstrated
 "`(1) that he was not at fault in creating the situation giving rise to the affray, (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of deadly force, and (3) that he did not violate any duty to retreat or avoid the danger.'" State v. Rust, 9th Dist. No. 23165, 2007-Ohio-50, at ¶ 10, quoting State v. Caldwell (1992), 79 Ohio App.3d 667, 679.
 {¶ 10} In the present case, the trial court was presented with conflicting evidence.
 {¶ 11} The trial court first heard testimony from Wendy Stafford ("Stafford"), Shafer's sister. She testified that Shafer was 56 on the day he died. She testified that Shafer was not in good medical condition. Stafford stated that Shafer had a broken leg that had never healed, and had just had surgery on his neck to replace and repair some vertebrae. She stated that because of his health problems Shafer could not stand for any period of time. Stafford testified that she spoke with Shafer in the early evening hours of February 15, 2007. She testified that he seemed *Page 5 
very sad. Stafford testified that she talked to Shafer later that night and that he was very upset. She stated the Shafer informed her that he had been badly hurt. Shafer told her that the back of his head was split open and that "the side of his face was smashed in." He informed her that he was going to the hospital in an ambulance. Shafer called Stafford three more times while he was in the hospital. Stafford testified that during these conversations, she pleaded with him not to go back to the hotel. She testified that he seemed scared in the phone calls. She testified to a photo taken of Shafer after he went to the hospital and stated that when she had seen him earlier in the week he did not have the bruises, contusions, abrasions, and lacerations to his face. On cross-examination, Stafford testified that Shafer could be argumentative on occasion and that he drank. She verified that in 1997, Shafer had been convicted of aggravated assault. On redirect examination, Stafford testified that Shafer did not sound intoxicated when she spoke with him on February 15, 2007.
 {¶ 12} The State next called David Neimeyer ("Neimeyer"), a forensic scientist at the Ohio Bureau of Criminal Investigation (BCI). He testified the he tested a knife in connection with the February 15, 2007 incident. He stated that the knife tested presumptively positive for blood. Stacy Violi ("Violi"), an employee in the serology/DNA section of BCI testified that she received the blood swabs from the knife to which Neimeyer testified. She explained that the DNA profile taken from the blood swabs was consistent with Shafer's DNA.
 {¶ 13} Stacy Frabotta ("Frabotta"), a firefighter/paramedic with the city of Akron, testified that she responded to the hotel around 9:30 p.m. on February 15, 2007. She testified that she was responding to an assault. She explained that due to an earlier snowstorm, the roads around the hotel were difficult to park on. She explained that upon arrival, she found Shafer in his room and that he had bruises and some cuts to his face and buttocks. She stated that he was *Page 6 
sent to the hospital to get stitches in the back of his head. Frabotta testified that Shafer informed her that someone had kicked open his door and hit him. She verified that before they left for the hospital, Shafer stopped to call his sister. Frabotta testified that around 3:37 a.m. on February 16, 2007, she responded again to the hotel. She testified that she responded this time to a report of a stabbing. Upon arrival, Frabotta found Shafer lying on his back, unresponsive. Frabotta testified that Hudson was at the scene. She then identified him in court. Frabotta explained that Shafer had no pulse and appeared to have been fatally stabbed.
 {¶ 14} On cross-examination, Frabotta stated that according to ambulance records, Shafer tested positive for alcohol after the first incident. The report further stated that Shafer admitted to having four beers prior to the first assault. On redirect-examination, Frabotta testified that Shafer did not appear intoxicated to her when she initially responded to the physical assault call.
 {¶ 15} Next, the trial court heard from Rena Jackson ("Jackson"), a former resident of the hotel. Jackson testified that on February 15, 2007, she lived at the hotel. She testified that she knew Shafer. She testified that the front desk was staffed 24 hours a day. Jackson explained that on February 15, 2007, she heard some yelling outside. When she looked out her window, she saw Hudson and Shafer. Shafer was sitting in his car and Hudson was outside the car looking into the driver's side window. She testified that neither Hudson nor Shafer appeared agitated and that she did not observe any physical contact between the two. Later in the evening, Jackson testified that she heard a loud knock and a door being kicked open. When she opened her door to investigate, she observed someone hitting Shafer. She testified that she did not recognize the man hitting Shafer and that it was not Hudson. Jackson testified that, although her room was located by the stairway where Shafer was killed, she did not hear any verbal or *Page 7 
physical fights on the morning of the February 16, 2007, and that she was unaware of Shafer's death until the police knocked on her door.
 {¶ 16} On cross-examination, Jackson testified that Hudson was a "very intelligent, kind, compassionate man." She further testified that the hotel had a rule against space heaters. She explained that this was because it would run up the electricity bill or cause a fire in the building. Jackson read a statement that she had made to the police on February 15, 2007, regarding the incident she observed between Shafer and Hudson at Shafer's car. According to the police report, Jackson observed Hudson with a bloody lip and with snow on his back. She testified that she asked Hudson what had happened and Hudson informed her that he had asked Shafer to move his car. On redirect, Jackson agreed that it was possible that Hudson had fallen in the snow and hit his lip.
 {¶ 17} The trial court also heard testimony from Anthony Long ("Long"), a former resident of the hotel. He testified that he personally knew Hudson and knew of Shafer. He testified that at around 10:00 p.m. on February 15, 2007, Hudson informed him that he and Shafer had gotten into a fight earlier in the day. According to Long, Hudson asked him and some other residents to make sure Shafer did not hurt him again. He further testified that during the early morning hours of February 16, 2007, he heard a commotion outside his door. When he went to investigate, Long saw Shafer lying on the ground with Hudson standing over him. He then observed Hudson leave the scene. According to Long, Hudson soon returned and told someone to call the police. Long further testified that he had spoken with Hudson after the incident and Hudson told him that Shafer pushed him twice and that he accidentally stabbed Shafer in the back when they fell into a wall together. Hudson also informed Long that he accidentally stabbed Shafer in the chest when Shafer fell on top of him. *Page 8 
 {¶ 18} The trial court heard testimony from Phillip Key ("Key"), another resident at the hotel. He testified that he knew Hudson and Shafer. He confirmed Long's testimony that around 10:00 p.m. on February 15, 2007, Hudson spoke to them about a fight he and Shafer had earlier in the day. Key testified that Hudson was on chemotherapy at the time and was weak. Key testified that he avoided Shafer because he got "bad vibes from him." He testified that he had no reason to not like Shafer and that Shafer had gone out of his way to be nice to him. In the early morning hours of February 16, 2007, Key heard a commotion in the stairway. When he went into the hallway, he saw Shafer lying on the ground. On cross-examination, Key testified that Shafer "seemed like he like to try people. He liked to just see if he could mess with you, get in your head, see how far he could push you to see * * * how far you gonna let him get away with it, and I didn't like people like that." He further testified that he did not know Shafer to have a reputation for violence, but stated that he "had a tendency to verbally try to assault people sometimes." He stated that he never knew him to be physical.
 {¶ 19} Michael Gallagher ("Gallagher") testified that he also lived at the hotel. He testified that he knew Hudson and Shafer. Gallagher further testified that on February 16, 2007, he observed a "scuffle," and he yelled at the men to break it up. He stated that he did not know who the men were, nor did he hear them arguing. As he approached the scene, he saw Hudson kneeling on top of Shafer. Gallagher testified that he grabbed Hudson by his shoulders to pick him up and then saw a bloody knife in Hudson's hand. Gallagher testified that he called 911. On cross-examination, Gallagher testified that he had previously had an argument with Shafer at a time Gallagher was working as an assistant manager. He explained that Shafer was trying to bully him. "[H]e was kind of a jerk, you know. I guess a lot of people had problems with him. He was always arguing and stuff." Gallagher further testified that Shafer was not aggressive but *Page 9 
was a "big loud mouth[.]" On redirect, Gallagher testified that the incident happened in a matter of a few minutes, but that he did not see the start of the incident so he was not sure what happened.
 {¶ 20} The trial court next heard testimony from Thomas Burkey ("Burkey"), another hotel resident. Burkey testified that he worked at the hotel. He testified that on February 15, 2007, he heard a commotion on the first floor of the hotel. When he went to investigate, he observed Shafer in his room while a man ran out the door before Burkey could identify him, but he knew it was not Hudson. Burkey further testified that he called 911 because Shafer was hurt. Burkey testified that he noticed that Shafer had a space heater but he did not confiscate it. He explained that space heaters were against building rules. Burkey testified that at approximately 3:30 a.m. on February 16, 2007, he went downstairs to work. He testified that while he was in the back of the hotel office, he heard Shafer approach the main desk. Burkey stated that Shafer was talking to the person on duty about getting his space heater back. Burkey testified that the man working at the front desk was hard of hearing, and therefore it was a possibility that Shafer was speaking loudly so that the man could hear him. After this discussion, the employee went to Hudson's room while Shafer stayed at the front desk. Hudson came out of his room to speak with Shafer, but Burkey could not hear what they were saying and testified that they were not raising their voices. He further testified that it did not appear as if they were engaged in a physical altercation. Burkey testified that when he looked out of the office door, he observed Shafer standing on the first step of the stairway while Hudson was standing on the bottom landing, facing Shafer. Burkey confirmed that Hudson was not impeded in any way from leaving the scene. He testified that he did not see either Hudson or Shafer with a weapon. According to Burkey, he heard a commotion, and then heard someone say that someone had *Page 10 
been stabbed. He stated that if Shafer and Hudson had been speaking loudly, he would not have heard it from where he was located. He testified that after the stabbing, Hudson came into the office and appeared upset. Burkey further testified that on the tape of the 911 call made immediately after the stabbing, he could hear Hudson say something like "[g]et that SOB out of here[.]" He further testified that Hudson did not attempt to give Shafer first aid.
 {¶ 21} On cross-examination, Burkey testified as to Shafer's reputation for violence or aggressiveness. "As long as Mr. Shafer was sober, he was the nicest person in the United States, okay? When he was drinking or he had been drinking, he had, like, the Dr. Jekyll and Mr. Hyde syndrome." Burkey further explained that "[h]is attitude would change. He would get this cockiness, toughness about him, like, he could lick the world, okay?" Burkey reiterated that most of Shafer's aggressiveness was verbal. Burkey testified that he could not tell if Shafer had been drinking on the night he was stabbed. Burkey testified on recross-examination that after the stabbing, Hudson informed him that he had been afraid of Shafer. On further redirect-examination, Burkey verified that Hudson did not tell him he was afraid of Shafer until after the instant case had begun.
 {¶ 22} The State then called Joe Sidoti, an Akron police officer. Officer Sidoti testified that on February 15, 2007, at approximately 11:40 p.m., he was dispatched to the Main Event bar. He explained that a bartender had called the police on Hudson's behalf because Shafer had called the bar and threatened Hudson. Officer Sidoti testified that upon arrival he observed Hudson drinking at the bar, and explained that Hudson "didn't seem particularly interested that we were there or not." Officer Sidoti further testified that Hudson was polite to him, but seemed disinterested and did not want to press charges. Officer Sidoti explained that when he spoke with Hudson, Hudson was drinking coffee, but Officer Sidoti stated that Hudson had previously *Page 11 
been drinking alcohol because he was intoxicated. He stated that in his opinion, Hudson was not afraid of Shafer. Officer Sidoti then went to Akron General Hospital to speak with Shafer. Officer Sidoti testified that Shafer was intoxicated and very angry that he had been assaulted. When asked about his injuries, Shafer informed Officer Sidoti that earlier in the day, he was sitting in his car when Hudson asked him to move it. When he refused to move his car, Hudson punched him through the window. Shafer denied punching Hudson, but did admit that he had pushed him to the ground. Shafer informed Officer Sidoti that later that day, an unknown individual broke into his room and assaulted him. Shafer told Officer Sidoti that he believed that Hudson had organized the attack. Officer Sidoti testified that Shafer was angry about the attack. Officer Sidoti testified that he advised Shafer not to go near Hudson and then called Hudson at the Main Event bar and advised him to stay away from Shafer. Officer Sidoti further testified that he was later dispatched to the hotel regarding a stabbing call. He explained that when he arrived at the hotel, Hudson let him in. Officer Sidoti testified that he was not surprised to learn of this altercation based on the earlier events that had occurred between Shafer and Hudson. Hudson told Officer Sidoti that "`He came after me again. I let him have it." When asked about the knife, Hudson took a knife out from under his shirt. Officer Sidoti took Hudson into custody. On cross-examination, Officer Sidoti testified that on February 15, 2007, Hudson was 72 years old. Officer Sidoti testified that he had interviewed Shafer at Akron General shortly after midnight and that Shafer was intoxicated. On redirect-examination, Officer Sidoti testified that Shafer was afraid of Hudson.
 {¶ 23} The State next called Dr. George Sterbenz, deputy chief medical examiner at the Summit County Medical Examiner's office. Dr. Sterbenz testified that he performed Shafer's autopsy. Dr. Sterbenz testified that when the police officers and medical examiner arrived at the *Page 12 
scene, Shafer was only recently deceased. Dr. Sterbenz testified that the knife used to stab Shafer was "about seven and a quarter inches in length with a maximal length of one inch."[1] He testified that the knife appeared to have a blood stain on it. Dr. Sterbenz testified that Shafer was a 56 year old man who weighed 217 pounds and was six foot three inches tall. Dr. Sterbenz stated that Shafer had two stab wounds to his chest, and one stab wound to his back, a cut on his left arm and other blunt force injuries. Dr. Sterbenz testified that the stab wounds to the chest resulted in significant internal bleeding. He further testified that the wounds were consistent with the knife police officers recovered from the scene. Dr. Sterbenz testified that the back wound and the wound on Shafer's arm were not fatal injuries. He further explained that Shafer had an enlarged heart and a history of alcohol abuse. He stated that Shafer's postmortem blood ethanol level was .034 percent and the legal driving limit of blood ethanol level is .096 percent. Dr. Sterbenz testified that the cause of death was the two stab wounds to the chest. He further testified that a large amount of force was necessary to inflict the chest wounds. On cross-examination, Dr. Sterbenz clarified that Shafer's blood alcohol level was lower than the legal driving limit. He explained that the legal driving limit forwhole blood was .08 percent, but that the legal driving limit forserum, which is what the medical examiner's office used, is .096 percent. Dr. Sterbenz stated that the wound on Shafer's arm appeared to be a defensive wound. He explained that this meant that it appeared to be "the type of wound that could be incurred during the course of defending against or fending off an attacker." He further explained that although it appeared to be a defensive wound, it did not necessarily mean that the wound actually occurred while Shafer was trying to defend himself. With regard to the back wound, Dr. *Page 13 
Sterbenz testified that it was possible that the Hudson and Shafer were facing each other and that Hudson reached around and stabbed Shafer in the back. It was also possible that the wound was inflicted with Shafer facing away from Hudson. On redirect examination, Dr. Sterbenz clarified that if the knife was held in the right hand, it was not possible that the wound was inflicted while the two men were facing each other.
 {¶ 24} The State next presented the testimony of Akron Police Officer Christopher Seiler. Officer Seiler testified that he responded to an assault call at the Main Event bar on February 15. He testified that Hudson was very indifferent. Officer Seiler testified that "[i]n my opinion he was more concerned about drinking his beer than he was with us being there." He further testified that Hudson did not appear fearful. Officer Seiler testified that he also spoke with Shafer at the hospital. According to Officer Seiler, Shafer appeared intoxicated, upset, and angry. Officer Seiler further testified that he thought Shafer was afraid of Hudson. Officer Seiler testified that he responded to a stabbing at the hotel at approximately 3:30 a.m. on February 16th. He indicated that his first contact at the hotel was with Hudson. He testified that Hudson appeared very calm. Officer Seiler testified that when he searched Hudson he found at least one pocket knife.
 {¶ 25} The State next presented the testimony of Detective Brian Reilly. Detective Reilly testified that he interviewed witnesses at the scene of the stabbing. He testified that he interviewed Hudson shortly after the stabbing occurred. He explained that Hudson appeared calm and indicated that he was not intoxicated. According to Detective Reilly, Hudson did not indicate that he was afraid of Shafer or in fear of his life. Further, Detective Reilly testified that Hudson never told him that he stabbed Shafer when they fell against a wall together or that he stabbed at his arm as a defensive move. Hudson informed Detective Reilly that Shafer had been *Page 14 
verbally abusive when Hudson asked him to move his car earlier in the day. According to Detective Reilly, Hudson then informed him that Shafer punched him and he fell to the ground. While on the ground, he was hit in the face five or six times and kicked in the ribs. Detective Reilly testified that when he interviewed Hudson he did not notice any injuries to his face other than a cut lip, and no visible injuries to his torso. Detective Reilly testified that Hudson's injuries did not appear consistent with his story that Shafer had punched him to the ground, repeatedly punched him in the face and kicked him in the ribs. During Detective Reilly's testimony, the State played a tape recording of his interview with Hudson. Further, the State provided the court with a transcript of this interview. According to the transcript, Hudson informed Detective Reilly that he thought Shafer was drunk during the incident at the car. Hudson further stated that after that incident he went and had a few beers. Hudson stated that a hotel employee woke him in the middle of the night to tell him that Shafer wanted to talk to him. Hudson went to speak with Shafer, and Shafer demanded his electric heater back. Shafer pushed Hudson. Hudson told Shafer that he was "not going to put up with it." After some more words, Shafer pushed Hudson again. Hudson informed Detective Reilly that during the fight, he had a knife under his belt. He explained that he put the knife under his belt when he went to bed. He stated "If this guy messes with me tonight I am gonna defend myself[.]" Detective Reilly then clarified that Shafer pushed Hudson twice and then Hudson pulled out his knife. Hudson agreed and stated "Well it's either that or he beat me up again." Hudson stated that he stabbed Shafer once and that Shafer "kept hollering and carrying on." Hudson stated that after he stabbed him, he pushed Shafer and Shafer fell to the ground. He stated that during the incident, he was not on the ground. Hudson stated that after he stabbed Shafer once, he went to the office window. Hudson again clarified that Shafer "started running backwards and I went after him and grabbed *Page 15 
him and stabbed him." On redirect examination, Detective Reilly opined that the fact that Shafer pushed Hudson twice was not severe enough to warrant stabbing Shafer.
 {¶ 26} After Detective Reilly's testimony, the State rested its case. Hudson then called Claudia Palmer ("Palmer") on his behalf. On February 15, 2007, Palmer was employed at the Main Event bar. She explained that she had known Hudson for over ten years. She stated that Hudson was on chemotherapy and that after his treatments he would get sick. Palmer testified that after he started chemotherapy, Hudson lost about 30 pounds and seemed to have trouble with his memory. She further explained that he would get tired very easily. Palmer testified that she knew Shafer and that "he was a nasty guy." She further testified that she had seen Hudson and Shafer together at the bar and that Shafer was aggressive towards another patron. As such, Palmer asked Hudson to remove Shafer from the bar. She testified that Shafer had attempted to attack another patron with a beer bottle. Because of his actions, Palmer would no longer allow Shafer into the bar. Palmer testified that she was working at the bar on February 15, 2007. She testified that Hudson came into the bar and had a band aid on his lip and looked "beat up." She stated that Hudson informed her that Shafer had knocked him down and kicked him. She stated that around 10 or 11 p.m., Shafer called the bar. She testified that Shafer threatened to kill Hudson. Palmer testified that Hudson was afraid of Shafer.
 {¶ 27} On cross-examination, Palmer stated that Hudson had just started his first round of chemotherapy the week before the stabbing. She further testified that Hudson was slightly intoxicated. Palmer testified again that Hudson looked like he had been beaten up when he came into the bar. When shown photographs that the police took of Hudson early on February 16, Palmer indicated that the photos did not show the injuries that she described. She further verified that she considered Hudson to be her friend. *Page 16 
 {¶ 28} Hudson testified on his own behalf. He testified that he had prostate cancer which spread throughout his body. He stated that he started chemotherapy treatments on February 9, 2007. He testified that he had known Shafer for about a year, and that at first, he thought Shafer was a good man. He stated that Shafer began drinking and his personality began to change. Hudson testified that he had learned from other people that Shafer was a violent person. He further testified that he tried to stay away from Shafer. He explained that he had heard that Shafer had "been convicted of murder or something. I don't know. He just come out of jail or something." Hudson testified that he was able to get along with Shafer most of the time. Hudson explained that on February 15, 2007, he and Shafer had a conversation by Shafer's car. Hudson asked Shafer to move his car so that the snow plows could plow the road. Shafer refused to move his car and as Hudson started to walk away, Shafer knocked him to the ground. Hudson testified that Shafer knocked him down five or six time then kicked him while he was down. Hudson testified that Shafer did not kick him hard. After the car incident, Hudson testified, he went inside, washed himself off, and then went to the Main Event bar. Hudson testified that after the car incident, he was afraid of Shafer. He testified that he had a few beers while at the bar. He further testified that Shafer called the bar and threatened to kill him. He stated that he allowed Palmer to call the police to report the threat. After speaking with the police, Hudson went home. He testified that he had nothing to do with the attack that sent Shafer to the hospital. Hudson stated that when he arrived home around midnight he asked some people to watch out for him if Shafer attempted to bother him again. Hudson testified that at that point he was afraid of Shafer and no longer trusted him. Hudson testified that before he went to bed, he went into Shafer's room to confiscate his space heater. Hudson testified that when he went to bed he did not take his clothes off so that he could be ready if Shafer came to his room. He also *Page 17 
testified that he put a knife in his pants so that if he was attacked he could defend himself. Hudson testified that a hotel employee knocked on his door and informed him that Shafer wanted to talk to him. Hudson stated that he initially refused to go talk to him, but the employee came back a second time. When Hudson went to the front office to talk to Shafer, Shafer demanded his space heater back. Hudson testified that Shafer "kept coming at me." When reminded that he had stated in his interview with Detective Reilly that Shafer had pushed him, Hudson stated that Shafer shoved him first. When asked if Shafer pushedand shoved him, Hudson agreed. After Shafer shoved him the second time, Hudson testified that he "wanted to let him know that I had this knife." He testified that he reached around Shafer's back to show him the knife. Hudson testified that he then stabbed Shafer in the chest because as they were wrestling, Shafer fell backwards and Hudson fell on top of him. Hudson testified that he did not know that he stabbed Shafer twice. Hudson testified that he stabbed Shafer because he was frightened. He testified that he thought Shafer was trying to get the knife from him and would then use it to kill him. Hudson testified that there was no way to get away from Shafer because Shafer was holding him. He stated that stabbing Shafer was the only way he thought he would have survived once the fight began.
 {¶ 29} On cross-examination, Hudson stated that Shafer had broken his nose during the car incident. He then stated that his nose was not broken. He testified that he did not know who beat up Shafer earlier in the day. When asked why he went to speak with Shafer about the space heater if he was so afraid that he slept with a knife and all his clothes on, Hudson stated that he thought if he did not willingly go talk to him that Shafer would kick down his door. He testified that when he first spoke with Shafer about the heater, Shafer was threatening him, but did not have his fists raised and Hudson did not see a weapon. He testified that when he reached around *Page 18 
Shafer's back he did not cut him, rather, he just put his knife on his back so that Shafer would know he had a knife. Hudson clarified that while the two men were facing each other, he grabbed Shafer with his left hand and reached around with the knife in his right hand. He further explained that when Shafer attempted to take the knife from him, he stabbed him in the chest. Then, according to Hudson, Shafer began to fall backwards and grabbed on to Hudson and pulled him down. Hudson stated that as they fell, the knife somehow came out of Hudson and then went back in again. He further stated that he accidentally stabbed Shafer when he fell on top of him. He clarified that he had stabbed Shafer before they fell down together. He again stated that he was afraid of Shafer. He testified that despite the fact that he fell on top of Shafer, he did not think he got blood on his clothes. Hudson testified that he had military training. He stated that he had a lot of friends at the hotel that would have beat up Shafer for him; however, he denied having anything to do with the attack that sent Shafer to the hospital. When asked about his interview with Detective Reilly, Hudson stated that what he told Detective Reilly was "similar" to what he stated on the witness stand. He further stated that in addition to the knife he used to stab Shafer, he had two pocket knives on him that night, although, he explained that they were work knives. Hudson reiterated that he used his right hand to stab Shafer because he was right-handed.
 {¶ 30} Our extensive review of the record reveals that the trial court did not lose its way when it determined that Hudson did not act in self defense. While the testimony reveals that Shafer had a reputation for being argumentative, that Shafer and Hudson had engaged in previous physical altercations, and that both had consumed some alcohol, these facts do not necessarily lead to the conclusion that Hudson acted in self-defense. *Page 19 
 {¶ 31} Most notably, Hudson's testimony on the witness stand differed from the statement he gave to Detective Reilly immediately following the stabbing. During his statement, he said that Shafer "started running backwards and I went after him and grabbed him and stabbed him." Further, we note that despite Hudson's alleged fear of Shafer, he entered Shafer's room, removed a space heater, and went to talk to Shafer at his request. As such, the trial court could find that Hudson did not have a bona fide belief that he was in imminent danger of death or great bodily harm. Rust, supra, at ¶ 10.
 {¶ 32} Further, Hudson's testimony regarding the stabbing was contradicted by several other State's witnesses. For example, Hudson testified that he believed that he only stabbed Shafer in the chest; however, Long testified that shortly after the incident, Hudson informed him that he had accidentally stabbed Shafer in the back when they fell into a wall. Hudson testified that he accidentally stabbed Shafer in the back while the two men were standing face to face. He testified that he was holding the knife in his right hand. However, this testimony is directly contradicted by Dr. Sterbenz's testimony that if the knife was held in the right hand, it was not possible that the wound was inflicted while the two men were facing each other. Hudson further testified that he initially stabbed Shafer while he was standing, then fell on him and stabbed him again. However, he informed Detective Reilly that he only stabbed Shafer once. His contradictory statements at trial were self-serving and as the trial court noted "def[ied] logic." As such, the trial court was justified in disbelieving Hudson's testimony and believing the statement Hudson gave to Detective Reilly. The finding of guilt was, therefore, not against the manifest weight of the evidence.
 {¶ 33} We note that Hudson takes issue with the trial court's finding that he had a duty to retreat prior to using deadly force. Although Hudson states this argument as a separate issue in *Page 20 
his brief, he does not separately assign it as error. App. R. 16(A). Neither does he support this argument with citations to any authority. Id. These drafting flaws aside, we again note that it was Hudson's burden at trial to prove all elements of self-defense. As we stated above, the trial court was justified in disbelieving Hudson's testimony and finding that he did not have "a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of deadly force[.]"Rust, supra, at ¶ 10. Having found that Hudson did not meet his burden at trial to prove imminent fear, we need not address his argument with regard to the duty to retreat.
 {¶ 34} We find that the evidence overwhelmingly supports the trial court's determination that Hudson was not acting in self-defense. Accordingly, Hudson's sole assignment of error is overruled.
 III. {¶ 35} Hudson's assignment of error is overruled. His sentence is modified and, as modified, the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the *Page 21 
period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. Costs taxed to Appellant.
CARR, P. J., CONCURS
[1] From the context of Dr. Sterbenz's testimony, we deduce that he was referring to the maximal width of the knife, rather than the maximallength.