[Cite as *State v. Austin*, 2025-Ohio-4543.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO            C.A. No.      30805

      Appellee

      v.                          APPEAL FROM JUDGMENT
                                          ENTERED IN THE

DUSTIN AUSTIN                     COURT OF COMMON PLEAS
                                          COUNTY OF SUMMIT, OHIO

      Appellant                     CASE No.      CR-2020-02-0497-A

DECISION AND JOURNAL ENTRY

Dated: September 30, 2025

---

CARR, Presiding Judge.

{¶1} Appellant, Dustin Austin, appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} This matter arises out a deadly shooting that occurred in Akron on the evening of December 31, 2019. D.B. lost his life as a result of the incident. The Akron Police Department ("APD") identified Austin as a suspect during its investigation into D.B.'s murder.

{¶3} The Summit County Grand Jury indicted Austin on a litany of charges in relation to the incident, including one count of aggravated murder, one count of murder, one count of felony murder, two counts of felonious assault, two counts of aggravated robbery, two counts of kidnapping, and one count of having weapons while under disability. All of the charges carried firearms specifications, with the exception of the count of having weapons while under disability. Austin pleaded not guilty to the charges at arraignment.

{¶4} Austin filed a motion to suppress on the basis that he was unlawfully detained by police and that he was denied his right to counsel during a post-arrest interrogation. The State filed a memorandum in opposition to the motion to suppress. After a hearing, the trial court issued a journal entry denying the motion.

{¶5} After a delay due to the COVID-19 pandemic, the matter proceeded to a jury trial. At the close of the State's case, the State moved to dismiss one count of felonious assault, one count of aggravated robbery, and one count of kidnapping. The jury found Austin guilty of the remaining offenses. The trial court imposed an aggregate prison sentence of life with the possibility of parole after 31 years.

{¶6} On appeal, Austin raises three separate assignments of error. This Court rearranges those assignments of error to facilitate review.

II.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS, IN VIOLATION OF [THE] FOURTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, ARTICLE ONE, SECTIONS TEN AND FOURTEEN OF THE OHIO CONSTITUTION, AND MIRANDA V. ARIZONA, 384 U.S. 436 (1966).

{¶7} In his third assignment of error, Austin argues that the trial court erred in denying his motion to suppress. This Court disagrees.

{¶8} This Court's review of the trial court's ruling on the motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. The trial court acts as the trier of fact during a suppression hearing and is best equipped to evaluate the credibility of witnesses and resolve questions of fact. *Id.*; *State v. Hopfer*, 112 Ohio App.3d 521, 548 (2d Dist. 1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653 (4th Dist. 1994). Consequently, this

Court accepts a trial court's findings of fact if supported by competent, credible evidence. *Burnside* at ¶ 8. Once this Court has determined that the trial court's factual findings are supported by the evidence, we consider the trial court's legal conclusions de novo. *See id.* In other words, this Court then accepts the trial court's findings of fact as true and "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist. 1997).

Background

{¶9} Austin raised a number of issues in support of his motion to suppress, including whether the affidavit offered in support of his arrest warrant was sufficient to support a probable cause finding and whether police violated Austin's right to counsel by proceeding with a post-arrest interview after Austin requested an attorney.

{¶10} The State called five witnesses at the suppression hearing. Four of the witnesses were APD detectives, including Sergeant Michael Orrand, who supervises the detective bureau. The State also called Charles Lasher, who supervises the criminal division at the Akron Municipal Court Clerk of Courts. After the hearing, the trial court issued a journal entry denying the motion to suppress wherein it set forth the following factual findings.

{¶11} Police launched an investigation upon responding to the scene of D.B.'s murder. In addition to interviews, the investigation included forensic cell phone data analysis as well as multiple identifications and photo arrays. Based on the investigation, police identified Austin as a suspect in the murder. Prior to preparing an affidavit for arrest, Sergeant Orrand consulted with the police legal advisor to make sure that there was sufficient evidence to obtain an arrest warrant. On January 8, 2020, Officer Orrand went to the clerk's office at the Akron Municipal Court and

presented the affidavit for arrest to Lasher. The probable cause statement on the affidavit read as follows: "On December 31st, 2019[,] at 2240 hours Dustin Austin knowingly caused the death of [D.B.] B/M 24." Sergeant Orrand testified that this particular affidavit was not as thorough as a typical affidavit for arrest because this case dealt with a number of sensitive issues and there was a concern for the safety of witnesses. Lasher swore in Sergeant Orrand and engaged in an inquiry about the lack of written details. Sergeant Orrand explained some of the sensitivity issues and provided information regarding the details of the investigation. Sergeant Orrand testified that he would have provided additional information upon request or taken an alternative path to securing an arrest warrant if necessary. Lasher testified that he did not remember the specific details of the conversation but, after asking Sergeant Orrand a series of questions, Lasher made an independent determination that probable cause existed to support the issuance of an arrest warrant.

{¶12} Police received a tip that Austin was residing on Cromwell Street in Akron. On January 16, 2020, Detective Troy Meech was in possession of the arrest warrant when he took part in a surveillance operation focused on the Cromwell Street address. Upon observing Austin enter a vehicle and drive away from the residence, police initiated a traffic stop and placed Austin under arrest. During the search incident to arrest, police found $741 in cash and 19 doses of suboxone. Police approached a woman who was with Austin at the time of the arrest and asked her for consent to search the residence that they had just left. The woman agreed and signed a written consent form.

{¶13} Austin was transported to the police station and placed in an interview room. Detective Troy Looney read Austin his *Miranda* rights and then initiated a conversation. Austin expressed a willingness to make a statement. Detective Taylor entered the room after the interview had commenced. Austin answered questions pertaining to D.B.'s murder. At one point, Austin

indicated that he did not want to answer questions without his lawyer. A video of the interview showed that Austin was willing to answer questions and then, at one point, he stated, "I don't wish to speak on that type of stuff without my lawyer present." Austin then said, "I'll answer any questions with my lawyer present." Detective Looney responded, "That's cool[]" and then indicated that the police just wanted to know what the incident was about. Austin indicated that he knew what the incident was about but he did not have anything to do with it. Detective Looney then asked why Austin was unwilling to talk about it. Austin then indicated that he had no problem addressing the matter. Detective Looney and Detective Taylor ultimately left the interview room and Detective Meech entered. Detective Meech indicated that police had found drugs during the search of the Cromwell Street residence. Detective Meech asked Austin if the drugs were his or if they should charge his girlfriend. Austin ultimately stated that the drugs belonged to him. Detective Looney and Detective Taylor subsequently returned to the interview room and questioned Austin about D.B.'s murder.

{¶14} Based on these facts, the trial court denied the motion to suppress. While Austin argued that police did not provide enough information for the clerk to make a probable cause determination, the trial court found that it was unnecessary to address that issue because the evidence presented at the suppression hearing demonstrated that the arresting officers reasonably relied on the arrest warrant in good faith.[1] Furthermore, the trial court rejected Austin's argument that the statements that he made in his post-arrest interview were obtained in violation of his constitutional rights. The trial court determined that while Austin asserted his right to counsel at

---

[1] The trial court also found that the search of the Cromwell Street residence was conducted with consent.

one point during the interview, he voluntarily initiated further communication with the officers, thereby waiving his right to counsel.

Discussion

{¶15}  Austin's argument challenging the trial court's suppression ruling focuses on the validity of the arrest warrant.[2]  Austin relies heavily on the Supreme Court of Ohio's decision in *State v. Hoffman*, 2014-Ohio-4795, where the high court held that a conclusory affidavit is not sufficient to support a probable cause finding in support of an arrest warrant.  *Id*. at ¶ 14.  Austin argues that concerns regarding sensitive issues and the desire to protect witnesses do not constitute a valid basis to withhold information that would otherwise be necessary to make a probable cause determination.  Austin further contends that his unlawful arrest led to an unlawful post-arrest interrogation and that the statements he made during the interview should have been suppressed.

{¶16}  The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The Ohio Constitution contains a virtually identical provision. Ohio Const., art. I, § 14.

{¶17}  Crim.R. 4(A)(1) states, in part, as follows:

If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed, and that the defendant has committed it, a warrant for the arrest of the defendant, or a summons in lieu of a warrant, shall be issued by a judge, magistrate,

---

[2] Although Austin notes in his merit brief that he requested an attorney during the post-arrest interview, he supports that statement with a footnote that states, "[Austin] concedes that the findings of the trial court with regards to the *Miranda* issue are consistent with the current caselaw in Ohio, but [Austin] raises the issues to avoid waiver."

clerk of court, or officer of the court designated by the judge, to any law enforcement officer authorized by law to execute or serve it.

{¶18} Austin's contention that the *Hoffman* decision compels reversal in this case is not well taken. *Hoffman* involved a scenario where a deputy municipal court clerk issued three misdemeanor arrest warrants under circumstances where the officer who sought the warrants had "failed to submit any information from which the deputy clerk could have found the existence of probable cause on the three misdemeanor charges." *Hoffman* at ¶ 6. Police decided to execute the warrants several weeks later after Hoffman became a suspect in a murder investigation. *Id*. at ¶ 2-4. In ruling on the motion to suppress, the trial court found that there was not a sufficient basis from which the deputy clerk could have made a probable cause determination and, further, that the municipal court's internal guidelines for handling warrants violated both the United States and Ohio Constitutions. *Id*. at ¶ 6. The trial court nevertheless overruled the motion to suppress on the basis that the officers who arrested Hoffman could not have been reasonably expected to question the authority of the arrest warrant and the officers "did not deliberately, recklessly, or with gross negligence violate Hoffman's rights[.]" *Id*. The Sixth District upheld the trial court's judgment. *Id*. at ¶ 9. In affirming the Sixth District's decision, the Supreme Court recognized that, with respect to the deputy clerk's probable cause determination, "[a] mere conclusory statement that the person whose arrest is sought has committed a crime is insufficient to justify a finding of probable cause." *Id*. at 14. Ultimately, however, the Supreme Court concluded that suppression was not an appropriate remedy given that the arresting officers had relied on the arrest warrants in good faith. *Id*. at ¶ 44. "When the police conduct a search in objectively reasonable, good-faith reliance upon binding appellate precedent, the exclusionary rule does not apply." *Id*. at paragraph three of the syllabus.

{¶19} While Austin focuses on the conclusory nature of the affidavit, this case does not involve a scenario where the trial court's suppression ruling was predicated on a finding that police provided the clerk with sufficient information to make a probable cause determination. Instead, the trial court found that it was unnecessary to resolve that issue because the evidence presented at the suppression hearing demonstrated that police acted in good faith in relying on the arrest warrant. The trial court relied on this Court's decision in *State v. Scott*, 2017-Ohio-358, ¶ 13-14, 18 (9th Dist.), where this Court held that it is unnecessary to determine whether an arrest warrant is valid when the record makes clear that the officers acted in good faith. In deciding *Scott*, the Court discussed the *Hoffman* decision extensively and noted that "[w]hether the exclusionary rule's remedy of suppression is appropriate in a particular context is a separate analysis from whether there has been a Fourth Amendment violation." *Scott* at ¶ 12, quoting *Hoffman* at ¶ 24. "The question that must be answered before evidence is ordered excluded is 'whether suppression of the evidence in this case will create a sufficient deterrent effect to prevent future violations of the Fourth Amendment and Article I, Section 14.'" *Scott* at ¶ 12, quoting *Hoffman* at ¶ 26. Evidence should not be suppressed when the officers relied on the arrest warrant and acted in good faith. *Scott* at ¶ 12.

{¶20} Under the circumstances of this case, the trial court properly denied Austin's motion to suppress. A review of the record supports the trial court's finding that the arresting officers acted in good faith in relying on the arrest warrant and had no reason to believe that the arrest warrant was not based on probable cause. To the extent that Austin contends that police engaged in misleading tactics in order to obtain the warrant, this Court draws a distinction between engaging in deceptive practices and holding certain information in reserve when preparing an affidavit for arrest with the aim of protecting certain witnesses. Sergeant Orrand's testimony at

the suppression hearing supports the trial court's conclusion that police were willing to provide additional information if necessary or take a different path to obtaining an arrest warrant. Furthermore, Sergeant Orrand did not participate in the execution of the arrest warrant and the officers who arrested Austin were not aware of any concerns with the arrest warrant. Accordingly, the trial court did not err in concluding that the arresting officers acted in good faith reliance on the arrest warrant.

{¶21} Austin further argues that the custodial interrogation in this case was predicated on a deficient arrest warrant. Austin suggests that the police failed to stop questioning Austin when he asked for an attorney even though they knew the arrest warrant was invalid. As noted above, this Court has determined that the trial court did not err in concluding that the arresting officers acted in good faith in relying on the arrest warrant. Accordingly, the exclusion of evidence was not an appropriate remedy given that the good faith exception was applicable. *See Scott* at ¶ 15, citing *Hoffman* at ¶ 29. Furthermore, while Austin notes in his merit brief that he requested an attorney during his post-arrest detention, he includes a footnote that states, "[Austin] concedes that the findings of the trial court with regards to the *Miranda* issue are consistent with the current caselaw in Ohio, but [Austin] raises the issues to avoid waiver." This Court's review of the post-arrest interview video supports the trial court's finding that Austin initiated further communication with police subsequent to invoking his right to counsel. Accordingly, the trial court did not err in concluding that police could continue to question Austin after he initiated further communication. *See State v. Tench*, 2018-Ohio-5205, ¶ 76.

{¶22} The third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER, IN VIOLATION OF SECTION 2903.01(B) OF THE OHIO REVISED CODE, AND

MURDER, IN VIOLATION OF SECTION 2903.02(A), AND FELONIOUS ASSAULT, IN VIOLATION OF SECTION 2903.11(A)(2) OF THE OHIO REVISED CODE, ARE UNCONSTITUTIONAL AS IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS BASED ON INSUFFICIENT EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

{¶23} In his second assignment of error, Austin argues that his convictions for aggravated murder, murder, and felonious assault were not supported by sufficient evidence and were against the weight of the evidence. Austin's core assertion is that the State failed to demonstrate that he acted purposely in the commission of these offenses. This Court disagrees.

**Sufficiency of the Evidence**

{¶24} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

Background

{¶25} At trial, the State presented evidence in support of the following narrative. On the evening of December 31, 2019, a small group gathered at a house on Kenyon Street in Akron for a New Year's Eve party. G.B. attended the gathering upon the invitation of M.A., who was the mother of his children and who also happened to be the cousin of Austin. A skirmish broke out when G.B. made a joke that offended one of M.A.'s female relatives. When M.A.'s relative struck

G.B., M.A. told G.B. to exit through the front door. The yelling continued as the skirmish spilled out of the house. At trial, G.B. testified that he was frustrated that M.A. had allowed her relative to strike him. G.B. explained that another party attendee, who feared retaliation against the relative, was loudly screaming, "Don't hit her." G.B. called his brother, D.B., and requested a ride home.

{¶26} D.B. arrived shortly thereafter in his Chevy Malibu to pick up G.B. D.B. exited the vehicle and helped G.B. retrieve his jacket. When G.B. began walking toward D.B.'s Chevy Malibu, G.B. looked down the street and noticed a man with a gun. The man pointed the gun at someone who was standing outside the residence that hosted the party. G.B. attempted to warn D.B. that someone was coming. G.B. then noticed two other men with guns. G.B. testified that one of the men was Austin, and that Austin was shouting orders to the others. G.B. explained at trial that "all I heard was: Strip those bitch-ass n******. Shoot them bitch-ass n******. Kill them bitch-ass n******." G.B. explained that Austin was "shouting out orders and stuff to everybody on what to do." Both G.B. and D.B. attempted to run away. G.B. was chased by Adarus Black, who was carrying a rifle-style gun. G.B. was able to evade Black by running through an empty lot, across a towpath trail, and into the canal. G.B. testified that D.B. was not able to get away. G.B. heard gunshots as he was pulling himself out of the water. G.B. testified that about a minute and a half elapsed between the time he started running and the point when he heard the gunshots.

{¶27} Deonbra Mosley, who was one of the three men who carried out the attack, testified on behalf of the State at trial. On the evening of the incident, Austin, Mosley, and Black gathered at a house on Princeton Street, which intersects with Kenyon Street. When the men heard yelling at a nearby house, Austin informed the men that he heard his cousin's voice. Austin began running toward Kenton Street and Mosley and Black followed. Austin was armed with a nine-millimeter

handgun with an extended clip that carried about thirty rounds. Mosley was carrying a nine-millimeter handgun and Black was armed with an AK-style rifle.

{¶28} Austin was the first to arrive at the scene and he was giving orders. Black began running in the direction where G.B. had fled. Austin ordered Mosley to strip D.B. Mosley testified that stripping the victim is a common practice during a robbery to ensure that the victim is unarmed while the perpetrators search the victim's clothes. Mosley held a gun to D.B. as D.B. removed his clothes. Mosley learned that D.B. did not have anything on him, so he instructed D.B. to put his clothes back on. Mosley testified that as he began walking back toward Princeton Street, he heard gunshots. At that point, he turned around and began shooting toward the Chevy Malibu. Mosley then noticed that "[e]verybody was shooting" at the vehicle. At trial, Mosley was asked if there was an exchange of gunfire or if the three men were the only ones firing weapons. Mosley responded that he only saw the three men firing at the vehicle. The three men then ran back to the house on Princeton Street. When Austin returned to the house, he indicated that D.B. was dead and that they needed to leave.

{¶29} M.A. testified that she had reentered her house prior to the arrival of the armed men. When a party attendee spotted the men, M.A. and her relatives crammed into a bathroom, at which point they heard "a whole bunch of shots." M.A. called 911. Police arrived soon thereafter and found D.B. lying naked in the front seat of his vehicle, having suffered several gunshot wounds. In addition to finding D.B.'s clothes in the driveway of the residence that had hosted the party, police discovered numerous shell casings in the street. In total, law enforcement recovered 47 shell casings from the scene – 15 rifle casings and 32 nine-millimeter casings. A forensic scientist from the Ohio Bureau of Criminal investigation testified that, based on his analysis of the evidence collected at the scene, at least three separate guns were fired during the incident.

Aggravated Murder

{¶30} Austin was convicted of aggravated murder in violation of R.C. 2903.01(B), which states, "[n]o person shall purposely cause the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape." R.C. 2901.22(A) provides that "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

{¶31} Austin challenges the sufficiency of the evidence with respect to his aggravated murder conviction on the basis that the State failed to demonstrate that he purposely fired the gun either during the commission of a robbery or while fleeing the scene thereafter. Austin highlights the portion of Deonbra Mosley's testimony where Mosley stated that the stripping of D.B.'s clothes occurred before the gunshots were fired. Austin argues that the gunshots were fired after the commission of the robbery was completed and, further, that Austin and Mosley were "merely walking to a nearby house[]" at the time the gunshots were fired.

{¶32} Austin's sufficiency challenge to his aggravated murder conviction is without merit. While Austin argues that he did not act purposely, the State presented evidence that Austin stormed the scene of the party and immediately began shouting instructions to his counterparts. Mosley's testimony demonstrated that Austin was the group's leader and that Austin initiated the confrontation after hearing his cousin yelling. In addition to ordering Mosley and Black to "[s]trip" and "[s]hoot" D.B. and G.B., G.B. testified that Austin specifically yelled, "Kill them bitch-ass

n\*\*\*\*\*\*." All three men fired shots at D.B., including Austin, who was standing a short distance from the vehicle. D.B. died as a result of suffering multiple gunshot wounds. Accordingly, the State presented evidence that Austin acted purposely given that it was his specific intent to cause D.B.'s death. *See* R.C. 2901.22(A).

{¶33} Furthermore, Austin's argument that the robbery and the murder were separate occurrences is not well taken. When interpreting the term "while" as used in R.C. 2903.01(B), the Supreme Court of Ohio has held that the term "neither requires that the killing occur at the same instant as the predicate felony, nor requires that the killing be caused by the predicate felony. Rather, the killing must be directly associated with the predicate felony as part of one continuous occurrence." *State v. McNeil*, 83 Ohio St.3d 438, 440 (1998). Here, the State presented evidence that the robbery and the murder were part of one continuous occurrence. Austin announced his intent to kill D.B. and G.B. upon arriving on the scene. While D.B. was initially ordered to strip during the robbery, the State presented evidence that no more than two minutes elapsed between the time that G.B. fled the scene and the time that the three men started firing at D.B.'s vehicle. Moreover, Mosley's testimony was that, while he began to walk away from the scene prior to hearing gunshots, Austin and Black remained in closer proximity to the vehicle. Mosley further testified that he did not see anyone other than Austin, Black, and himself firing gunshots. It follows that the evidence presented at trial, when construed in the light most favorable to the State, was sufficient to sustain Austin's conviction for aggravated murder.

### Murder and Felonious Assault

{¶34} Austin was convicted of murder in violation of R.C. 2903.02(A), which states, "[n]o person shall purposely cause the death of another[.]" As noted above, R.C. 2901.22(A) provides that "[a] person acts purposely when it is the person's specific intention to cause a certain result,

or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

{¶35} Austin was also convicted of felonious assault in violation of R.C. 2903.11(A)(2), which states, "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance."    R.C. 2901.22(B) states that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

{¶36} Similar to his argument regarding his aggravated murder conviction, Austin challenges the sufficiency of the evidence with respect to his convictions for murder and felonious assault on the basis that the State failed to demonstrate that he acted with the requisite intent. Austin argues, "[w]ithout knowing the intent of the guns being fired, it is impossible to know the intent of the shooter or shooters.  It is unclear from the record if the shots were fired on purpose or [by] accident – or were done with the purpose of killing another or in reaction to the belief that they were being shot at."

{¶37} Austin cannot prevail on his sufficiency challenge in regard to his murder conviction.  While Austin suggests that it is not possible to know whether the shooters acted purposely, the State presented evidence that Austin appeared at the scene and ordered his counterparts to shoot and kill D.B. and G.B.  Although G.B. was able to flee the scene, Austin and

the other two men subsequently opened fire on D.B.'s vehicle as he sat in the driver's seat. Austin's assertion that the men may have thought they were being shot at stands in contradiction with the testimony of Mosely, who indicated that he did not see any other shooters. Furthermore, the large number of shell casings recovered at the scene dispels the notion that the men fired their guns by accident. Viewing this evidence in the light most favorable to the State, the State met its burden of demonstrating that Austin acted purposely in causing the death of D.B.

**{¶38}** In regard to Austin's sufficiency challenge to his conviction for felonious assault, Austin states that, like his convictions for aggravated murder and murder, "[a] similar purposeful element [was] required to demonstrate that [Austin] is guilty of the offense of felonious assault." Notably, the State was only required to demonstrate that Austin acted knowingly, and not purposely, in order to obtain a conviction for felonious assault under R.C. 2903.11(A)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The State presented evidence that Austin was the leader of the men who perpetrated the deadly shooting of D.B. Austin ordered Black and Mosley to shoot D.B. and then subsequently joined them in firing numerous rounds gunshots into D.B.'s vehicle, where D.B. was sitting in the driver's seat. This evidence was sufficient to demonstrate that Austin acted knowingly in carrying out the felonious assault.

**{¶39}** Accordingly, Austin's sufficiency challenges to his convictions for aggravated murder, murder, and felonious assault are without merit.

## Weight of the Evidence

**{¶40}** Austin further contends that his convictions for aggravated murder, murder, and felonious assault are against the weight of the evidence. Because challenges to the sufficiency of

the evidence and challenges to the weight of the evidence involve different legal standards, it is not appropriate to combine sufficiency and weight arguments within a single assignment of error. *See State v. Torrence*, 2022-Ohio-3024, ¶ 13 (9th Dist.); App.R. 16(A)(7). While Austin set forth a sufficiency argument, a review of Austin's merit brief reveals that he has not set forth a separate argument pertaining to the weight of the evidence in support of his second assignment of error. As Austin has not presented a manifest weight argument, this Court will not create one on his behalf. *Torrence* at ¶ 14; *see also* App.R. 12(A)(2). To the extent that Austin argues that his convictions are against the weight of the evidence, his argument is not well taken.

**{¶41}** The second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT FAILED TO INQUIRE OF EITHER APPELLANT OR COUNSEL IF HE WISHED TO TESTIFY IN HIS TRIAL, DEPRIVING HIM OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND RIGHTS UNDER ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION.

**{¶42}** In his first assignment of error, Austin argues that the trial court failed to conduct an inquiry into whether he wished to testify in his own defense. Austin maintains that there is nothing in the record indicating whether he wished to remain silent. This Court disagrees.

**{¶43}** The Fifth Amendment to the United States Constitution provides that "no person shall be . . . compelled in any criminal case to be a witness against himself[.]" The Ohio Constitution similarly provides that "[n]o person shall be compelled, in any criminal case, to be a witness against himself[.]" Ohio Const., art. I, § 10. Criminal defendants also have a fundamental right to testify in their own defense that emanates from the Fifth Amendment privilege against self-crimination, the Compulsory Process Clause of the Sixth Amendment, as well as the Due Process Clause of the Fourteenth Amendment. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987).

{¶44} The Supreme Court of Ohio has held that a trial court is not required to conduct an inquiry into whether a defendant wishes to testify in his own defense. *State v. Bey*, 85 Ohio St.3d 487, 499 (1999). "In reaching this conclusion, the Supreme Court noted that such an inquiry is unnecessary, and arguably could be harmful to the extent that the inquiry 'places the judge between the lawyer and his client and can produce confusion as well as delay.'" *State v. Manso*, 2014-Ohio-1388, ¶ 34 (9th Dist.), quoting *Bey* at 499.

{¶45} Austin's argument is not well taken. A review of the trial transcript makes clear that the trial court afforded Austin the opportunity to present a defense at trial. Contrary to Austin's assertion, the trial court was not required to conduct an inquiry into whether Austin wished to waive his right to testify. *Bey* at 499. Moreover, much like the circumstances confronted by the Supreme Court in *Bey*, there is nothing in the record here indicating that Austin was unaware of his right to testify in his own defense or that trial counsel failed to adequately advise him of that right. *Bey* at 499-500. Accordingly, Austin has not demonstrated that the trial court violated right to testify in his own defense.

{¶46} Austin's first assignment of error is overruled.

### Supplemental Briefing

{¶47} This Court's review of the record revealed that the trial court imposed sentence on the first three counts of the indictment, namely count one: aggravated murder with an attendant firearm specification; count two: murder with an attendant firearm specification; and count three: felony murder with an attendant firearm specification. The trial court imposed life sentences with parole eligibility on counts one, two, and three, and ordered that those sentences were to be served concurrently. The trial court further ordered that the sentences for the firearm specifications on counts one and two were to be served consecutively to each other and consecutive to the sentence

imposed on count one, while the sentence for the firearm specification on count three was to run concurrently with the sentences for the other charges and firearm specifications at issue in the case. This Court asked the parties to file supplemental briefs regarding whether the sentence in this case implicated the principles discussed in *State v. Huertas*, 51 Ohio St.3d 22, 28 (1990).

**{¶48}** The parties filed supplemental briefs and this Court has reviewed those filings. Upon consideration of the supplemental briefs submitted by the parties, we are not persuaded that this case involves anything more than a merger issue that was not raised below. In the years since *Huertas* was decided, the Supreme Court has clarified the law surrounding allied offenses and merger. A defendant's failure to seek merger at the time of sentencing results in forfeiture of that issue for the purposes of appellate review. *State v. Rogers*, 2015-Ohio-2459, ¶ 21. Here, as Austin did not raise the issue of merger at sentencing, he has forfeited that issue for the purposes of appellate review.

### III.

**{¶49}** Austin's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

HENSAL, J.
SUTTON, J.
CONCUR.

APPEARANCES:

ADAM M. VANHO, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.